UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVE SANDS,

                            Plaintiff,

        - against -                                    Case No. 18-cv-07345 (JSR)

CBS INTERACTIVE, INC.

                            Defendant.

**COUNTERSTATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(b)
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, defendant CBS Interactive, Inc. ("CBSi") respectfully

submits the following additional material facts and responses to the Statement of Material Facts

submitted by plaintiff Steve Sands ("Sands") in support of its Motion for Summary Judgment against

CBSi on the issues of liability for copyright infringement under 17 U.S.C. § 501, willfulness under

17 U.S.C. § 504(c)(2) and attorneys' fees and costs under 17 U.S.C § 505 (Dkt. 22).

1.    Sands is a professional photographer who has been in the business of licensing his
      work for over 40 years. [Declaration of Steve Sands, dated January 25, 2019 ("Sands
      Declr.") ¶ 3]

**CBSi's Response: Denied, but immaterial.  Sands testified that he did not remember the

last time he licensed a photograph directly himself, Lackman Decl. ¶ 2, Ex. A at 154:6–9, and

he recalled no licensing arrangement he had made in the past five years for online uses, *id.* at

297:19–298:2. Moreover, the works claimed in this case, and other on-set photographs in the

nature of those claimed in this case, were licensed by Getty Images (U.S.), Inc. ("Getty") and

other third parties, not through Sands' claimed business of licensing.  *See* Dkt. 19 ¶ 12, Ex. E.**

2.    Over the course of Sands' career, he has taken thousands of photographs of
      celebrities using innovative techniques to capture images that resonate with
      audiences. [Sands Declr. ¶ 4]

**CBSi's Response: Denied, but immaterial.** Sands has not proffered any evidence that the photographs he claims he took in this case use innovative techniques, or that they resonate with audiences; rather, he testified that, on film and/or television sets, he often stands behind the cameraman, and has no input into any of the creative decisions, such as the subject, rendition, timing, shadow, lighting, or environment. Lackman Decl. ¶ 2, Ex. A at 66:12–19, 94:10–95:7, 154:10–15, 156:18–23, 173:14–174:8.

3.   Sands' photographs of celebrities have commanded upwards of $125,000 for a single photo shoot. [Sands Declr. ¶ 4]

**CBSi's Response: Denied.** Sands incorporates as part of the aforementioned paragraph a single document that is not fully executed, and which appears to show that in 2004, he signed an agreement that proposed that he be paid $125,000 for exclusive use of a group of photographs pertaining to a highly in-demand subject (the then-recent birth of Gwyneth Paltrow and Chris Martin's daughter) for the cover and interior of print and online editions of *People* Magazine, as well as for promotional use. Sands Decl. ¶ 4, Ex. A, at Preamble & ¶ 2. The draft agreement contained a restriction against licensing any other photographs from the "same situation." *Id.* at ¶ 3. Further, as the agreement is unsigned, involves a very different subject and context, is not an on-set photograph, pertains to different media and uses, is from over ten years ago, and purports to be exclusive, it also is immaterial. *See also* Lackman Decl. ¶ 2, Ex. A at 121:8–13 ("Like if I get a photo of Gwyneth Paltrow with her baby that's exclusive and nobody else has, it goes up substantially to what I request."), 124:20–125:24 (discussing exclusivity factor), 127:25–126:11 (explaining that he cannot recall any online-only publication that ever licensed a set of photographs for $1500–$2500 each), 69:3–8 & 252:3–4 (asserting that $3000 is his "starting point" for negotiations of a license for an exclusive photograph).

**Sands' attempt to use this unrelated example as evidence is also contradicted by his own deposition testimony as to this case, in which he readily admitted that online use of his photographs is of no value, and is not even on his radar, except when the claim can be turned over to his counsel.** *See id.* **at 128:20-129:4 ("online is very minor to me").**

4.  CBSi is a largescale, for-profit media company. [Declaration of Richard Liebowitz, dated January 25, 2019 ("Liebowitz Declr.") ¶ 13 (Ex. C); CBS Interactive Inc.'s Responses and Objections to Plaintiff Steve Sands' First Set of Requests to Admit, dated January 7, 2019 ("RFA") # 5 (*RFA is attached as <u>Exhibit I</u> to Liebowitz Declr. ¶ 21*).

**CBSi's Response: Admitted that CBSi is a for-profit media company.  CBSi cannot address the characterization of "largescale," a term that is not in the Exhibit I that is cited as part of the Liebowitz Declaration, but the size of the company is immaterial in copyright cases.** *See Mango v. BuzzFeed, Inc.***, 316 F. Supp. 3d 811, 814 (S.D.N.Y. 2018) (total net worth is not relevant to a potential statutory damages calculation).**

5.  According to its website, CBSi is a division of CBS Corporation and "is the premier online content network for information and entertainment." [Liebowitz Declr. ¶ 14 (Ex. C)]

**CBSi's Response: Admitted, but immaterial.**

6.  CBSi is in the business of publishing news. [RFA #6]

**CBSi's Response: Admitted, but immaterial.**

7.  GameSpot is one of the brands listed on CBSi's website. [Liebowitz Declr. ¶ 14 (Ex. C)]

**CBSi's Response: Admitted.**

8.  CBSi owns and operates GameSpot at URL www.gamespot.com (the "GameSpot Website"). [RFA #7; Answer ¶ 1 (defendant's operative Answer is attached as Exhibit H to Liebowitz Declr. ¶ 20); Liebowitz Declr. ¶ 15 (Ex. D)]

**CBSi's Response: Admitted.**

9.  Since September 2016, CBSi has been sued for copyright infringement at least 16 times in this District for exploiting photographs without authorization from the

rightsholder(s). [Liebowitz Decl. ¶ 16 (Ex. E)]

**CBSi's Response: Admitted, but notes that 14 of those lawsuits were filed by the Liebowitz Firm, Sands' counsel.  *See* Dkt. No. 20-6.  CBSi further states that this is immaterial, as the filing of a lawsuit does not establish liability, and that the statement should be stricken because Sands (in two instances) and Liebowitz Firm clients (in the other matters resolved by agreement) acknowledged that CBSi was not admitting liability, and they represented that they would not use the fact of settlement as a basis for any point of fact or law whatsoever.  *See* Dkt. No. 31, Exs. E & F; Dkt No. 30 at 4.**

**Sands' argument that "the number of lawsuits filed against an entity" should impute willfulness is particularly unconvincing given that Sands' counsel has conceded to wrongfully filing lawsuits where licenses were properly entered into, including as against CBSi. Lackman Decl. ¶ 3, Ex. B [Correspondence between CBSi and Sands' Counsel, dated January 31, 2017]; *See Sands v. CBS Interactive Inc.*, No. 17-cv-00531-RA (S.D.N.Y. 2017).**

10.    According to the public record, 14 out of 16 infringement lawsuits brought against CBSi have reportedly been "settled," "settled in principle," "resolved" and/or dismiss with prejudice by stipulation of the parties (with each to bear their own costs, expenses and attorneys' fees). [Liebowitz Decl. ¶ 17 (Ex. F)]

**CBSi's Response: Admitted to the extent the description reflects the courts' dockets, but the statement should be stricken for the reasons set forth in CBSi's response to Paragraph 9, *supra*.**

11.    Prior to this action, Sands filed suit against CBSi for copyright infringement three separate times. According to the public record, two of those infringement suits [18-cv-3793 and 18-cv-5315] were "settled in principle" and the cases terminated shortly thereafter. [Liebowitz Decl. ¶ 18 (Ex. F)]

**CBSi's Response**: Denied.  Sands filed suit against CBSi four times, and he withdrew one without consequence to Sands when CBSi was able to quickly pull up proof of license. Lackman Decl. ¶ 3, Ex. B [Correspondence between CBSi and Sands' Counsel, dated January 31, 2017]; *See Sands v. CBS Interactive Inc.*, No. 17-cv-00531-RA (S.D.N.Y. 2017).

12.    On or about October 5, 2016, Sands photographed actors Jon Bernthal and Deborah Ann Woll in New York City on the set of the Netflix series *The Punisher* (the "Photographs"). [Sands Declr. ¶¶ 5, 9 (Exs. B, C)]

**CBSi's Response**: Denied.  Sands previously stated that he took the photographs on October 5, 2016, not "on or about" such date.  Lackman Decl. ¶ 2, Ex. A at 247:15–248:3. The images attached as Exhibit C to the Sands Declaration were belatedly produced following Sands' deposition, despite being requested prior to his deposition; accordingly, there was no opportunity to cross-examine him about them, and they should not be considered as a result. Lackman Decl. ¶ 4, Ex. C at 3 [CBSi's Request for the Production of Documents, dated September 28, 2018]; *id.* ¶ 5, Ex. D [Correspondence regarding production of documents Bates-stamped SANDS_0960-0961].  Moreover, certain evidence provided suggests that certain of the photographs were created on a different day, as discussed *infra* at ¶ 63.

13.    Sands created the Photographs for the purpose of licensing to news outlets and media organizations. [Sands Declr. ¶ 8]

**CBSi's Response**: Admitted that Sands created the photographs for purposes of exploiting what they showed.  Denied that he had permission to do so.  Lackman Decl. ¶ 2, Ex. A [Sands Tr.] at 98:9–25, 135:8–136:5, 137:16–139:18, 155:19–23.  Sands has specifically had protracted correspondence with Netflix and its public relations firm Slate PR, about his inability to gain permission to sets and entertainment-related events.  Lackman Decl. ¶ 6, Ex. E [Correspondence Relating to Netflix's *Iron Fist*].  In one instance, for example, after accessing a set without authorization, Sands obtained photographs from Netflix's *Iron Fist*

television series that, if released, would have spoiled key plot points. *Id.* Without considering the hard work hundreds of cast and crew put into producing the series in question, and in order to gain access to an upcoming NBC event, Sands emailed Netflix's public relations agency: "I'd rather not release [the photographs], but it depends on the respect and courtesy I get from being credentialed for this premiere . . . I will await your reply gently keeping my trigger finger on the SEND button for 'iron fist' spoiler you hopefully won't force me to release." *Id.* Sands has gone to other extreme lengths to obtain access to film sets in order to free-ride off the creative works of others. See Lackman Decl. ¶ 2, Ex. A at 141:13-22 (detailing Sands various arrests for crashing sets).

14.    On or about October 5, 2016, Sands licensed the Photographs to Getty Images, a third-party stock photograph agency with website at www.GettyImages.com ("Getty"). [Sands Declr. ¶¶ 10-12 (Exs. D, E)]

**CBSi's Response: Admitted to the extent Exhibit E (the "Getty Invoice") was created in the regular course of business by Getty and it reflects the act of Photographs purportedly taken by Sands being licensed, but denied to the extent Sands testified that he knew nothing about the Getty Invoice.** *See* **Lackman Decl. ¶ 2, Ex. A at 226:2–226:3 ("I can't really comment on that. You'll have to ask Getty.");** *id.* **at 226:17–226:19 ("I don't know their codes. That's their codes. That's proprietary to them."). Further, denied to the extent Exhibit D is a spreadsheet created by Sands, and is not admissible evidence to demonstrate factual matter.**

15.    On or about October 6, 2016, third-party publisher Evolve Media, LLC ("Evolve Media") licensed the Photographs from Getty. [Sands Declr. ¶ 12 (Ex. E)]

**CBSi's Response: Admitted that Evolve Media, LLC ("Evolve Media") licensed photographs for $4.88 each from Getty Images, for which Sands received $2.44 per**

**photograph. Denied to the extent that Sands' declaration testimony conflicts with his deposition testimony about what the licenses cover.** *Compare* **Sands Decl. ¶¶ 10–12, 14–15,** *with* **Lackman Decl. ¶ 2, Ex. A at 89:3–90:6, 162:12–163:14, 201:2–202:2, 252:17–253:2, 255:9–256:11, 258:6–9. Sands also claimed at his deposition that he was sure that Evolve Media did not license the photographs.** *Id.* **at 159:5–15, 160:22–161:5, 163:11–14, 246:17–21.**

16.   Evolve Media owns and operates the website www.comingsoon.net. [Sands Declr. ¶ 13 (Ex. F)]

**CBSi's Response: Admitted.**

17.   After licensing the Photographs from Getty, Evolve Media then posted the Photographs on its website at https://www.comingsoon.net in an article entitled "Jon Bernthal Starts Filming Marvel's The Punisher." [Sands Declr. ¶ 14 (Ex. G)]

**CBSi's Response: Denied in part. The article published by Evolve Media that is potentially relevant to this lawsuit was entitled "A Daredevil Series Character Appears on The Punisher Set." Dkt. 20 ¶ 23, Ex. K, Interrogatory Response Number 2 [CBS's Interactive Inc.'s Amended Answers and Objections to Plaintiff's First Set of Interrogatories] ("Defendant avers that it is not certain where the Photographs were obtained from, but based on the "comingsoon.net" watermark on the Photographs used in the Article, they were likely taken from the website comingsoon.net, and the following specific URL: https://www.comingsoon.net/tv/news/773867-a-daredevil-series-character-appears-on-the-punisher-set?slideshow=129885#/slide/50.** *See* **Lackman Decl. ¶ 7, Ex. F [Excerpts from copy of Article Entitled "A Daredevil Series Character Appears on the Punisher Set"].**

**The article referenced by Sands in ¶ 17 above is dated October 3, 2016, three days before the Photographs were supposedly taken by Sands. Lackman Decl. ¶ 7, Ex. F-1 [Excerpt from Copy of Article Entitled "Jon Bernthal Starts Filming Marvel's** *The Punisher*"].**

18.   When Evolve Media published the Photographs to the comingsoon.net website under a license from Getty, it included an attribution to Sands under each one of the Photographs. [Sands Declr. ¶ 15 (Ex. F)]

**CBSi's Response**: Denied.  *See* Lackman Decl. ¶¶ 7-14.  Sands has provided no evidence that the Photographs initially published on the comingsoon.net website included an attribution to Sands.  *Id*.  Further denied to the extent Sands references the wrong ComingSoon.net article in his Motion.  *See* Lackman Decl. ¶ 7, Ex. F [Complete Copy of Article Entitled "Jon Bernthal Starts Filming Marvel's *The Punisher*"].  Further denied because even if Sands *had* referenced the same article that CBSi identified in its Interrogatory Responses, CBSi made it clear that it was "not certain where the Photographs were obtained from," *see* Dkt. 20 ¶ 23, Ex. K.  Further denied due to evidence that the comingsoon.net article was updated since it was initially published.  *See* Lackman Decl. ¶ 7, Ex. F.  Further denied due to evidence that it is customary for photographs posted on the website comingsoon.net, and otherwise licensed from Getty Images, not to attribute photographers.  *See* Lackman Decl. ¶ 8, Ex. G [Other Photographs on ComingSoon.net Website without CMI]; *id*. ¶ 15, Ex. L [Getty Images Agreement].  Further denied to the extent that a side-by-side comparison of the photographs currently available on ComingSoon.net and the Photographs at issue demonstrates that CBSi could not have possibly used a version of the photographs that had credit to Sands. ¶ 10, Ex. H [Close Up Comparison of Two Uses].

Further denied to the extent that Sands misrepresents that the documents provided by Evolve Media are "business records," falsely implying that they were created in the regular course of business at the time the Photographs were originally posted, when, in fact, they were produced to CBSi pursuant to a subpoena.  Dkt. 19 ¶ 13; Lackman Decl. ¶ 13, Ex. I [Evolve Media Subpoena].  Further denied to the extent that Sands cannot provide affirmative proof of the way the website located at the URL comingsoon.net appeared in 2016 because he did not seek if from Evolve Media directly, and the Internet Archive's Wayback Machine does not have records of the any of the www.comingsoon.net website pages containing any of the

**Photographs. Lackman Decl. ¶ 14, Ex. J [Wayback Machine Printout].  Indeed, CBSi's counsel communicated this to the Liebowitz Firm on January 11, 2019, and the issue was presumably resolved. Lackman Decl. ¶ 12.  In any event, it would not have been unusual for the ComingSoon.net article to have omitted credit to Sands. Pursuant to the Getty Agreement produced by Sands, there is no such requirement.  Lackman Decl. ¶ 15, Ex. L [Getty Agreement].**

19.    On or about October 7, 2016, CBSi published an article on its GameStop Website entitled *New Punisher Images Reveal Return of Key Daredevil Character* at the URL    https://www.gamespot.com/articles/newpunisher-images-reveal-return-of-key-daredevil/1100- 6444279/ (the "GameSpot Article"). [RFA #15; Answer ¶¶ 1, 10; Sands Declr. ¶¶ 16-17 (Exs. H, I)]

**CBSi's Response: Denied to the extent that CBSi does not own any "GameStop" website.  Dkt. 27, ¶ 1. Further denied to the extent that the documents identified as Exhibit H and I to the Sands Declaration are incomplete or otherwise do not accurately reflect the referenced article but rather reflect excerpts and click-throughs of each photograph.  *See* Lackman Decl. ¶ 15, Ex. K [GameSpot Article at Issue].  Otherwise admitted.**

20.    As part of the GameSpot Article, Defendant displayed the Photographs on the GameSpot Website. [RFA #15; Answer ¶ 1; Sands Declr. ¶¶ 18, Exs. H, I]

**CBSi's Response: Denied to the extent that CBSi did not use the Photographs, but instead used a version of the Photographs bearing a "comingsoon.net" watermark as part of the article on the URL identified at Paragraph 19 of Sands' Local Rule 56.1(a) statement.**

21.    Before this lawsuit was filed, the Photographs were prominently displayed on the GameSpot Website. [Sands Declr. ¶¶ 18 (Exs. H, I)]

**CBSi's Response: Denied to the extent that CBSi did not use the Photographs, but instead displayed a version of the Photographs bearing a "comingsoon.net" watermark.  Further denied that they were "prominent" for reasons stated in CBSi's response to Paragraph 19.**

22.    Commercial advertisements are visible on the face of the GameStop Article in which the Photographs are displayed. [RFA #33; Sands Declr. ¶¶ 19 (Exs. H, I)]

**CBSi's Response: Admitted that, like with nearly all media, advertising supports journalism. Denied that the commercial advertisements are tied to any specific article.** *See* **Liebowitz Decl., Ex. K, at Response to Interrogatory Nos. 33-34. Further denied that there is any "GameStop" article at issue.**

23.    On the face of the GameSpot Article, Sands was <u>not</u> credited as the author or owner of the Photographs. [RFA #24; Sands Declr. ¶ 20 (Exs. H, I)]

**CBSi's Response: Admitted. The Photographs contained a watermark crediting the website on which these apparent publicity stills were displayed.** *See* **Declaration of Dan Auty ("Auty Decl.") (Dkt. No. 25) ¶¶ 5–6.**

24.    On the face of the GameSpot Article, each of the Photographs bears the watermark "ComingSoon.net" but omits any credit or attribution to Sands. [RFA # 24; Sands Declr. ¶ 21, (Exs. H, I); Defendant CBS Interactive Inc.'s Amended Answers and Objections to Plaintiff's First Set of Interrogatories, dated January 2, 2019 ("INT") #s 2-3 (*INT is attached as* <u>*Exhibit K*</u> *to Liebowitz Decl.* ¶ *23*)]

**CBSi's Response: Admitted.**

25.    Before this lawsuit was filed, a full-color, full-scale reproduction of each of the Photographs was prominently displayed in the GameSpot Article on the GameSpot Website. [Sands Declr. ¶ 18 (Exs. H, I)]

**CBSi's Response: Denied.** *See* **Lackman Decl. ¶ 15, Ex. K.**

26.    No aesthetic alterations were made to the Photographs as displayed on the GameSpot Website. [Sands Declr. ¶ 18 (Exs. H, I)]

**CBSi's Response: Admitted that the photographs were reproduced in an authentic manner,** *see* **Auty Decl. ¶ 5, but denied to the extent that the Photographs as displayed on the GameSpot Website contained comingsoon.net watermarks, and were arranged to fit in the article itself.** *See* **Lackman Decl. ¶ 15, Ex. K.**

27.    Before this lawsuit was filed, the text published by CBSi in the GameSpot Article read in its entirety:

**New Punisher Images Reveal Return of Key Daredevil Character** Woll I never! – Last updated by Dan Auty on October 7, 2016 at 3:00AM.

It was reported earlier this week that Marvel's Punisher show had start [sic] shooting in New York. Following the first on-set images of star Jon Bernthal, more pictures of the production have emerged, in addition to some casting news. The latest images show Bernthal with actress Deborah Ann Woll, who plays Karen Page in Daredevil and will reprise her role in The Punisher. Check them out below, via Comingsoon.net.

In terms of the new cast, Marvel and Netflix yesterday announced that Ben Barnes, Ebon Moss-Bachrach, and Amber Rose Revah had joined the series. Barnes will play Billy Russo, a friend of Frank Castle's from his Special Forces days, while Moss-Bachrach will portray former NSA analyst Micro. Revah joins as Dinah Madani, a highly-trained Homeland Security agent.

The studio also confirmed that *The Punisher* will hit Netflix in 2017. The streaming service already has *Iron Fist* scheduled for next March, and it was originally though that superhero team-up show *The Defenders* -- which will feature Daredevil, Jessica Jones, Luke Cage, and Iron Fist -- would follow later in the year

However, with that show yet to start production, *The Punisher* will most likely take the now established Fall slot for a Marvel series in 2017, with *The Defenders* following in 2018.

In addition, a second season for Jessica Jones and a third for Daredevil are in the works. *Jessica Jones* showrunner Melissa Rosenberg recently explained that although she is not directly involved with *The Defenders*, the fact that it will be screened before *Jessica Jones* Season 2 was influencing what she writes for her show.

I need to know what they're doing in order to plan for Season 2 of Jessica, and they need to know what we're planning on in turn," she said. "Marvel is very smart and they enjoy collaboration, so there's never one maniac trying to take ownership."

Got a news tip or want to contact us directly? Email news@gamespot.com

[Sands Declr. ¶ 22 (Exs. H, I)]

**CBSi's Response**: **Admitted, except denied that such text appears in the cited Exhibit**

**H.**

11

28.    CBSi did not seek Sands' permission to publish the Photographs. [Answer ¶11; RFA # 35; Sands Declr. ¶ 23]

**CBSi's Response: Admitted.**

29.    CBSi does not, and has never had, a license to use the Photographs. [Answer ¶¶ 11, 14; RFA #36]

**CBSi's Response: Admitted, although Mr. Auty reasonably believed he had authorization to use publicity stills, as is common practice, and was not aware that unauthorized photographers enter sets to exploit production companies' work for the photographers' own profit.** *See* **Auty Decl. ¶¶ 4, 8–9.**

30.    Sands never granted CBSi authorization to copy the Photographs or distribute copies of the Photographs to the public. [Answer ¶ 11; RFA # 37; Sands Declr. ¶24]

**CBSi's Response: Admitted, although Mr. Auty reasonably believed he had authorization to use publicity stills, as is common practice, and was not aware that unauthorized photographers enter sets to exploit production companies' work for the photographers' own profit.** *See* **Auty Decl. ¶¶ 4, 8–9.**

31.    Prior to CBSi's publication of the Photographs on the GameSpot Website, there was no communication between Sands and CBSi concerning the Photographs. [Sands Declr. ¶ 25]

**CBSi's Response: Admitted, although there would be no circumstance under which CBSi would have communicated with Sands prior to publication of any photographs, as he does not license photographs directly.** *See* **Lackman Decl. ¶ 2, Ex. A at 129:19–24, 151:19– 154:9.**

32.    Before this lawsuit was filed, there was no communication between Sands and CBSi concerning the Photographs. [Sands Declr. ¶ 26]

**CBSi's Response: Denied. Sands was aware of the uses of the images and had previously sued CBSi regarding other on-set photographs, but Sands never mentioned the photographs**

**he claims in this case.** *See* **Dkt. No. 30 [Motion to Amend] at 2–4, 12; Lackman Decl. ¶ 2, Exs. A at 40:9-41:3; 77:13-16.**

33.     At no time prior to the institution of this lawsuit did Sands ever make any representations of any kind to CBSi concerning the Photographs. [Sands Declr. ¶ 27].

**CBSi's Response: Denied in part.  Sands represented in settling two other cases that he sought to resolve all outstanding claims he had against CBSi; admitted that no representations were made regarding the Photographs specifically.** *See* **Dkt. No. 30 [Motion to Amend] at 3–4.**

34.     CBSi has licensed Sands' photographs from Getty for purposes of displaying celebrity photographs on its various platforms or websites. [Sands Decl. ¶ 28, Ex. J]

**CBSi's Response: Admitted that CBSi and certain affiliates repeatedly licensed photographs Sands purports to own on over a dozen occasions over the past three or so years. Denied to the extent that the document attached to the Sands Declaration as Exhibit J does not show the photographs, and therefore Sands has not established the nature of such photographs (including whether or not they are on-set photographs).**

35.     CBS Television Studios has licensed Sands' photographs from Getty for purposes of displaying celebrity photographs on its various platforms. [Sands Declr. ¶ 28, Ex. J]

**CBSi's Response: Admitted that CBS Television Studios has licensed photographs that Sands purports to own.  Denied to the extent that the document attached to the Sands Declaration as Exhibit J does not show the photographs, and therefore Sands has not established the nature of such photographs.  Further denied that the President of Mexico is categorized as a "celebrity."**

36.     From August 2015 through May 2017, CBSi and CBS Television Studios, collectively, licensed at least 12 photographs from Sands via Getty. [Sands Declr. ¶ 28, Ex. J]

**CBSi's Response**: Subject to the caveats stated in response to Sands' paragraphs 34 and 35 above, admitted that CBSi and CBS Television Studios have licensed at least 12 photographs, that Sands purports to own, via Getty Images for between $8 and $36.54 per photograph. *See* Dkt. 19-10, Ex. J.

37.    From August 2015 through October 2016, CBSi licensed at least two photographs from Sands via Getty, including a photograph of Naomi Watts and a photograph of Steven Soderbergh. [Sands Declr. ¶ 28 (Ex. J, SANDS_705; SANDS_243)]

**CBSi's Response**: Subject to the caveats stated in response to Sands' paragraphs 34-36 above, admitted.  Further noted that Sands denied knowledge of such licenses during his deposition.  Lackman Decl. ¶ 2, Ex. A at 27:8–11.

38.    On October 16, 2016, the very same day that Evolve Media licensed the Photographs from Sands for use on comingsoon.net, CBSi licensed a photograph of Naomi Watts from Sands via Getty. [Sands Declr. ¶ 29 (Ex. J, SANDS_705)]

**CBSi's Response**: Denied on the basis that Evolve Media licensed the Photographs from Sands for use on comingsoon.net on October 6, 2016, not October 16, 2016.  Dkt. 19 ¶ 12, Ex. E.  Admitted that CBSi licensed a photograph that Sands claims to own on October 6, 2016, and admitted that CBSi licenses photographs where it has reason to believe that they are not publicity stills issued from studios for purposes of media use, or where there is no other basis to believe a license exists. *See* Auty Decl. ¶ 8.

39.    CBSi believes that it has licensed a Sands photograph directly from him or indirectly from a licensing agency. [RFA #44]

**CBSi's Response**: Admitted.

40.    CBSi has licensed photographs directly from photographers. [RFA #8]

**CBSi's Response**: Admitted.

41.    CBSi has written license agreements for uses of photographs. [RFA #10]

**CBSi's Response**: Admitted.

42.    Some news articles published by CBSi do not contain photographs. [RFA #30]

**CBSi's Response: Admitted, but immaterial, as the subject of the article in this case was about the release of on-set photographs and the photographs themselves.**

43.    CBSi routinely licenses photographs from Getty for purposes of disseminating entertainment content. [Sands Declr. ¶ 28 (Ex. J)]

**CBSi's Response: Admitted that CBSi routinely licenses photographs from Getty Images for a variety of material; denied that it does so exclusively.** *See* **Auty Decl. ¶¶ 4, 8 (discussing practice of using publicity stills).**

44.    CBSi routinely licenses photographs from stock photography agencies such as Getty [Sands Declr. ¶ 28 (Ex. J)]

**CBSi's Response: Admitted that CBSi routinely licenses photographs from stock photography agencies such as Getty Images, but denies that it does so exclusively.** *See* **Auty Decl. ¶¶ 4, 8.**

45.    Randolph Ramsay is the Editor in Chief of the GameSpot Website. [INT #12]

**CBSi's Response: Admitted.**

46.    Randolph Ramsay is the editor of the GameSpot Article in which the Photographs appeared and maintains supervisory control over the editorial process concerning the GameSpot Article. [INT#s 12, 14]

**CBSi's Response: Denied. CBSi stated that Mr. Ramsay would be most knowledgeable of the circumstances surrounding any editorial involvement pertaining to the article, and that he has supervisory control over the GameSpot website in general.** *See* **Liebowitz Decl. Ex. K, Answers to Interrogatory Nos. 12, 14. Sands never noticed the deposition of Mr. Ramsay or otherwise sought any depositions from any party in this action.** *See* **Lackman Decl. ¶ 27.**

47.    Dan Auty is listed as an editor on the GameSpot website. [Liebowitz Declr. ¶ 15 (Ex. D)]

**CBSi's Response: Denied. The screenshot attached as Exhibit D to the Liebowitz Declaration categorizes Auty under "Edit," which in context clearly refers to him as a party**

**making text copy, as opposed to video, social, or web development work. Dkt. 20, ¶15, Ex. D.**

**He is not identified as an "editor."**

48.     CBSi has no records or documents concerning CBSi's decision to use the Photographs, including communications to from and between any person or persons who participated in the decision-making process to use the Photographs. [Defendant CBS Interactive Inc.'s Amended Objections and Responses to Plaintiff's First Set of Requests for the Production of Documents, dated December 26, 2018 ("RFP") # 2] (*RFP is attached as Exhibit J to Liebowitz Declr. ¶ 22).*

**CBSi's Response: Admitted that no contemporaneous records exist, but denied that no**

**records exist pertaining to the decision to use the photographs claimed in this case. CBSi**

**provided the testimony of the author of the article at issue, whom Sands took no steps to**

**examine. *See* Auty Decl.; Lackman Decl. ¶ 20, Ex. O [Amended Disclosures].**

49.     CBSi has no records or documents concerning CBSi's process of editing the Photographs, including all communications to, from and between any person or persons who participated in the editorial process. [RFP #3]

**CBSi's Response: Admitted, but CBSi avers that Mr. Ramsay was identified as a**

**witness with knowledge regarding any editing process or procedures pertaining to the article**

**and any contents contained therein, *see* Liebowitz Decl., Ex. K, Response to Interrogatory No.**

**14, but Sands never sought to take testimony from Mr. Ramsay. Lackman Decl. ¶ 20, Ex. O.**

50.     CBSi has no records or documents concerning CBSi's efforts to identify the name of the copyright holder, copyright owner and/or copyright author of the Photographs. [RFP #6]

**CBSi's Response: Admitted that no contemporaneous records exist, but denied that no**

**records exist pertaining to Mr. Auty's understanding of the copyright owner of the**

**photographs claimed in this case. *See* Auty Decl. ¶ 8.**

51.     CBSi has no records or documents concerning CBSi's efforts to identify the name the photographer of the Photographs. [RFP #7]

**CBSi's Response: Admitted that there were no records concerning efforts to identify**

**the photographer, as no photographer was identified, and such photographs are typically**

distributed by studios without photographer attribution; denied that there are no documents, as CBSi has submitted written testimony from the author of the article at issue in the case. *See* Auty Decl.; *see also* Lackman Decl. ¶ 15, Ex. L [Getty Agreement].

52. CBSi has no records or documents concerning CBSi's efforts to contact the photographer of the Photographs prior to CBSi's publication of the Photographs. [RFP #8]

**CBSi's Response**: Admitted that there were no records concerning efforts to contact the photographer, as no photographer was identified, and such photographs are typically distributed by studios without photographer attribution; denied that there are no documents, as CBSi has submitted written testimony from the author of the article at issue in the case. *See* Auty Decl.; *see also* Lackman Decl. ¶ 15, Ex. L.

53. CBSi has no records or documents concerning CBSi's efforts to license the Photographs. [RFP #9]

**CBSi's Response**: Admitted. *But see* Auty Decl. ¶ 8.

54. CBSi has no records or documents between CBSi's counsel and any editor or journalist concerning publication of the Photographs prior to the Photographs' publication in the GameSpot Article. [RFP #10]

**CBSi's Response**: Admitted.

55. CBSi has no records or documents concerning CBSi's internal policy, Standards & Practices, or other guidance for obtaining permission, consent or license to any copyrightable material and which were in effect at the time the Photographs were published to the GameSpot Website. [RFP #11]

**CBSi's Response**: Denied. *See* Liebowitz Decl., Ex. J at Response No. 11 for an accurate statement of CBSi's position regarding the cited Request that Sands seeks to use as a basis for the false and unsupported claim that CBSi has no policies or procedures pertaining to licensing or other use of third-party content. Further, CBSi identified a witness with knowledge pertaining to the issues in this case, and Sands made no effort to take his testimony. *See*

**Lackman Decl. ¶ 20, Ex. O. Accordingly, by failure to properly avail himself of the discovery procedures available to him, Sands has failed to create an issue of fact.**

56. CBSi is not certain where the Photographs were obtained from, but based on the "comingsoon.net" watermark on the Photographs used in the Article, CBSi avers that the Photographs were likely taken from the website comingsoon.net, at the following specific URL: https://www.comingsoon.net/tv/news/773867-a-daredevil-series-character-appears-on-the-punisher-set?slideshow=129885#/slide/50. [INT #s 2-3]

**CBSi's Response: Admitted, but averred that, if the Photographs were, in fact, taken from the website located at the URL https://www.comingsoon.net/tv/news/773867-a-daredevil-series-character-appears-on-the-   punisher-set?slideshow=129885#/slide/50, they were taken in the form that the Photographs appeared in 2016 (without CMI), not as they appear now (with CMI).  *See* Auty Decl. ¶ 8.**

57. During discovery, CBSi refused to identify the name of CBS' in-house counsel who oversees CBS's standards or policies for licensing photographs. [INT #15]

**CBSi's Response: Admitted that CBSi declined to answer Sands' improper, irrelevant, overbroad, confusing, and unfounded interrogatory.  *See* Liebowitz Decl, Ex. J at Response No. 15.  Sands never stated any basis for the request, nor did he seek to take testimony of any witness with knowledge of the facts who might have been able to identify any relevant witness that might be called for pertaining to the website at issue in this case, and therefore he has failed by his own lack of prosecution to establish an issue of fact.  *See* Lackman Decl. ¶ 20, Ex. O.  In any event, the fact is immaterial in light of Auty's testimony and Sands' failure to establish that CBSi does not act in good faith with respect for others' rights.**

58. During discovery, CBSi refused to identify any procedures or practices that CBSi uses for securing licenses to photographic content. [INT #16]

**CBSi's Response**: Admitted that CBSi declined to answer Sands' improper, irrelevant, overbroad, confusing, and unfounded interrogatory.  *See* **Liebowitz Decl., Ex. J at Response No. 16.  Sands never stated any basis for the request, nor did he seek to take testimony of any witness with knowledge of the facts who might have been able to describe the procedures and practices that CBSi uses for licensing or otherwise using third-party material on the relevant website at issue in this case, and therefore he has failed by his own lack of prosecution to establish an issue of fact.  Dkt. 20-9, Request Number 7 (defining "GameSpot" as the website available at the URL "game*stop*.com") (emphasis added); Lackman Decl. ¶ 21, Ex. P (requesting "[a]ll records, documents and communications concerning the subject matter of the Photographs: *Dale Earnhardt Jr.*") (emphasis added).  In any event, the fact is immaterial.**

59.    During discovery, Defendant produced a grand total of 9 pages of documents (excluding documents it obtained via third-party subpoenas). Plaintiff, on his part, produced over 1300 pages of documents. [Liebowitz Declr., ¶ 24]

**CBSi's Response: Admitted that CBSi produced roughly nine pages of documents, which consisted of all documents pertaining to the case, and all documents appropriately requested.  *See* Dkt. 20-9; Lackman Decl., Ex. P.  Sands never sought discovery in a form that would elicit facts pertaining to the issues on which he moves and has waived the opportunity to do so.  *Id.*  Further admitted that on Sands produced an over 600-page PDF that was labeled "Sands v. Vice."   Lackman Decl. ¶ 18, Ex. N [Correspondence from Sands' Attorney Attaching "Sands v. Vice" labelled PDF]. Further admitted that during a subsequent meet-and-confer, Sands' counsel explained that when he produces discovery in Sands' cases, it is a "cut-and-paste" job, and he just reuses the same material.  *Id.* ¶ 18.  Further admitted that another 300 pages of Sands' production consisted of printouts of Getty invoices for a three-year span, and that yet another 300 pages of Sands' production consisted of printouts from PACER.  Lackman Decl. ¶ 24.  Further admitted that CBSi undertook significant efforts to**

**subpoena third-parties, such as the Evolve Media, Getty, Marvel, Backgrid, and Netflix. Sands did not serve any third-party subpoenas. Lackman Decl. ¶ 20. Sands even showed up to his deposition not knowing which photographs were at issue. Lackman Decl. ¶ 2, Ex. A at 9:3-24; 68:3-5.**

60.    Shortly after the filing of the present lawsuit, CBSi removed the Photographs from the GameSpot Article. [Sands Declr. ¶ 30 (Ex. K)]

**CBSi's Response: Admitted that upon first receiving notice (via this lawsuit), CBSi promptly removed the claimed photographs without conceding that it was obligated to do so.**

61.    Plaintiff's counsel in this action, Liebowitz Law Firm, PLLC (the "Firm"), follows a routine practice of registering photographs with the U.S. Copyright Office (the "USCO") on behalf of the Firm's clients. [Liebowitz Declr. ¶ 5; Declaration of Donna Halperin, dated January 25, 2019 ("Halperin Declr.") ¶ 4]

**CBSi's Response: Disputed on the ground that Richard Liebowitz was not disclosed as a witness with knowledge prior to the close of discovery, and therefore his testimony should be precluded or the right to take his deposition should be granted under Fed. R. Civ. P. 56(d). *See* Lackman Decl. ¶ 22, Ex. Q [Sands' Supplemental Initial Disclosures].[1]  Admitted that Halperin has been identified as someone who handles registration but noted that no documentation was provided regarding any such "routine practice," nor were documents pertaining to the process of registering the photographs claimed in this case produced prior to the taking of the deposition of Sands, and therefore Sands should be precluded from offering such evidence in support of his motion or at trial. *See* Lackman Decl. ¶ 25.**

62.    Plaintiff authorized the Firm to register the Photographs with the USCO on his behalf. [Sands Declr. ¶ 32]

---

[1] Moreover, none of the declarations contain the proper oath required by 28 U.S.C. § 1746, which requires verification as to the truth and correctness of the statements made in such declarations, and therefore the Court may strike all the declarations on that basis.

**CBSi's Response**: Admitted that Sands deferred the entire registration process to an employee at the Liebowitz Firm. *See* Lackman Decl. ¶ 2, Ex. A at 110:4–21, 112:24–113:6.

> 63.    On or about November 28, 2016, the Firm depositing the Photographs with the USCO as part of an application for copyright registration. [Halperin Declr. ¶¶ 7-13 (Exs. B-G); Liebowitz Declr. ¶ 8]

**CBSi's Response**: Disputed, as the statement is a mere fragment and otherwise is nonsensical. Further disputed on the ground that Richard Liebowitz was not disclosed as a witness with knowledge prior to the close of discovery, and therefore his testimony should be precluded or the right to take his deposition should be granted under Fed. R. Civ. P. 56(d). *See* Lackman Decl. ¶ 22, Ex. Q [Sands' Supplemental Initial Disclosures]. Further disputed on the ground that Sands testified that he sends his photographs collectively to the Liebowitz Firm for registration, *See* Lackman Decl. ¶ 2, Ex. A at 112:24–6, 114:4–115:23, yet the Halperin Declaration indicates that the photographs claimed in this case were saved on two different days. Such testimony is insufficiently reliable given that the registration attached as Exhibit L to the Sands Declaration appears to contain photographs of Bernthal and Woll from October 7 and 14, and Sands testified that he took photographs on set on just one day. *See* Lackman Decl. ¶ 2, Ex. A at 114:10–14, 120:3–6, 171:6–23. Moreover, the documents attached as Exhibits C-G were requested prior to the deposition of Steve Sands, on January 10, 2019, yet they were not produced until the last day of discovery despite having been accessed (apparently only by a client relations manager at his lawyer's office) two days prior to the deposition. *See* Lackman Decl. ¶¶ 26. Accordingly, Sands should be precluded from relying on such documents. Further, Sands did not provide his own metadata, despite requests for it. Lackman Decl. ¶ 4, Ex. C at 3.

> 64.    Sands is in possession of a registration certificate for the Photographs, bearing number VA # 2-024-098, with effective date November 28, 2016 (the "098 Registration") [Sands Declr. ¶ 33 (Ex. L); Liebowitz Declr. ¶ 9 (Ex. A); Halperin

Declr. ¶ 8 (Ex. B)]

**CBSi's Response**: Admitted that the Copyright Office issued a registration certificate for the claimed photographs, but it appears that the Liebowitz Firm may have may have committed some errors in the application process: Sands testified that he does not review his copyright applications and instead defers wholly to the Liebowitz Firm on registration. *See* Lackman Decl. ¶ 2, Ex. A at 33:6-15; 81:20-82:19; 84:7-8; 90:3-6; 201:9-202:2; 276:14-19; 305:6-24; 316:7-17; 357:20-24. Plaintiff submits a declaration from Donna Halperin, an employee of Sands' counsel, the Liebowitz Firm, attesting to "facts" that Sands admitted he was not aware of during his deposition. Id.; Dkt. No. 21. Sands testified that he sends all photographs from a shoot in one batch, but the metadata annexed to Ms. Halperin's affidavit—and belatedly produced to CBSi following Sands' deposition—indicates that Sands sent the Photographs on two different dates, October 7 and October 14, 2016. *Id.* at 43:6-23; Halperin Declr. ¶ 8 (Ex. B). The registration certificate, on the other hand, shows two sets of photographs of the actors shown in the Photographs (on October 5 and 14, 2016), which suggests that the required titles given to the images do not reflect the images themselves. Cplt. Ex. B. Moreover, Sands testified that he took the Photographs for two hours with no wardrobe changes, but the metadata from Halperin shows the actors in two different outfits. Lackman Decl. ¶ 2, Ex. A at 155:12–18, 172:7–25, 175:5–25, 177:11–23, 325:23–327:3, 348:2–25. If Sands had produced his metadata for the photographs as requested before his deposition and subsequently, and if the documents submitted from Halperin were similarly produced prior to the deposition, the conflicts regarding the images and the apparent inconsistencies in documents and testimony could possibly have been clarified.

65.     Sands obtained the 098 Registration within five years after first publication of the Photographs. [Sands Declr. ¶ 34; RFA #4]

**CBSi's Response: Admitted that the registration certificate alleged was issued within five years after first publication of the photographs that appeared on comingsoon.net.**

66.    The Firm's registration of the Photographs on Sands' behalf was carried out in accordance with the Firm's routine practice of registering photographs with the USCO on behalf of its clients. [Halperin Declr. ¶ 14; Liebowitz Declr. ¶ 11]

**CBSi's Response: Disputed, to the extent that the "routine practice" of the Firm would consist of registering titles that corresponded to the dates the photographs were taken, which appears to conflict with Sands' testimony.  *See supra*, Response to Paragraph 64.  Sands failed to provide evidence pertaining to the "routine practice" of registering photographs, and he was unfamiliar with those practices during his deposition.  Lackman Decl. ¶ 2, Ex. A at 103:5–13, 110:4–21, 112:24–113:6.**

67.    On or about December 12, 2018, the Copyright Office certified that the Photographs are on deposit with the 098 Registration. [Liebowitz Declr. ¶ 12 (Ex. B); RFA #2]

**CBSi's Response: Admitted that the claimed photographs were included in the deposit for the registration at issue, but disputed as to whether the titles accurately reflect the photographs submitted by Sands to the Liebowitz Law Firm.  *See* Response to Paragraph 64, *supra*.**

## STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(b) IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.    Sands, without authorization, crashed the set of Netflix's *The Punisher* on October 5, 2016, and took photographs of the cast in their staged positions, without making any original choices regarding creation of the subject, rendition, timing, shadow, lighting, or environment.  Lackman Decl. ¶ 2, Ex. A at 65:23-66:19 (identifying only choice of background, which was inherent to the location Marvel picked); 94:10-95:7 (claiming that value of photographs was that actor was shown with a beard, which was not Sands' choice); 154:10-15 (Sands simply stands next to the camera

man); 156:18-23 (same); 173:22-174:8 (admitting he does not "control things" on set, like lighting, depth).

2.      Sands does not dispute that he had little input; indeed, he acknowledges that others do the work; his view is that he has the "right" to exploit it, even over the creators' objections.  *Id.* at 137:16-138:20.

3.      Sands stated that the "environment" of a photograph is "just as important as the foreground," and then admitted that he had "[a]bsolutely no[]" involvement in picking the environment of the photographs.  Lackman Decl. ¶ 2, Ex. B at 66:14–19.  Sands admitted that he did not spend time editing, adjusting the lighting, or otherwise making any adjustments to the Photographs.  *Id.* at 148:10–22 (when asked if he edited the Photographs at issue Sands responded, "probably not.").

4.      Sands also admitted that he stands behind the camera at times to see what the cameraman is filming.  *Id.* at 154:10–15; 156:18–23.

5.      Sands conceded that when "photos all look the same [] there's no creativity involved." *Id.* at 65:2–4.  At his deposition, he was unable to distinguish between photographs taken by another photographer on *The Punisher* set, and his own:

> Q. Mr. Sands, do you recognize what's been marked as Exhibit 8? . . .
> A. I don't -- I only can remember the photos that I authorized as were stolen. Whether I recognize this as mine, I have to go to my computer . . .
> Q: Is there anything about -- anything about photographs that you take where you would say this is my style, the lighting, I recognize the depth, I recognize that I was close, anything like that? . . .
> A: In this?  As – and I also testified, or said at a deposition. . . that I don't control things . . .  I didn't light it. But do I like this shot? Yes. Would I have taken it if I saw it, absolutely.

*Id.* at 148:10–22.

6.    Despite the lack of original choices warranting copyright protection of his Photographs, Sands failed to identify the Photographs as derivative works on his copyright registration.  Cplt., Ex. B (registration).

7.    Sands acknowledges that it is common practice for media outlets to credit what appear to be publicity stills to studios. *Id.* at 250:18-25.

8.    Sands knows that studios distribute publicity stills that look just like the photographs he takes on sets. Indeed, at his deposition, he was not sure whether a photograph was his or a publicity still. *Id.* at 348:2-248:15.

9.    In fact, many online entities used these Photographs without attribution to Sands, likely believing them to be "still photographs" from the set of the Punisher.  *See, e.g.*, *Marvel's the Punisher*, MMA JUNKIE: FORUM (Apr. 4, 2017), http://forum.mmajunkie.com/forum/threads/marvels-the-punisher.70991/; *Punisher Set Photos: Frank Castle Has Seen Better Days*, SYKO.ORG (Apr. 3, 2017), http://www.syko.org/2017/04/punisher-set-photos-frank-castle-has.html.

10.    Despite Sands' knowledge—for over two years—that many entities have been using the Photographs online without authorization from him, he did not pursue any of them until August of 2018.  Lackman Decl. ¶ 2, Ex. A at 131: 23 – 132:13.

11.    Pursuant to Sands' agreement with Getty (*see* Lackman Decl. ¶ 16, Ex. L), Getty has the exclusive right to control any litigation related to photographs they distribute for him, and Sands can "only pursue a claim only if Getty [] elects not to do so." *Id.*

12.    Also pursuant to Sands' agreement with Getty, he receives fifty percent of the fees that Getty generates licensing photographs for him.  *Id.*

13.     Sands defers to the Liebowitz Firm regarding whether to file a lawsuit; notably, he never seeks a resolution in advance of suing.  *Id.* at 33:6-15; 81:20-82:19; 84:7-8; 90:3-6; 201:9-202:2; 276:14-19; 305:6-24; 316:7-17; 357:20-24.

14.     On May 1, 2017, Getty sent a letter to Sands terminating its agreement with him. Lackman Decl. ¶ 17, Ex. M [Getty Termination Letter].