# EXHIBIT A

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    STEVE SANDS,
4
                                PLAINTIFF,
5

6           -against-          Case No.:
                               18-cv-07345
7                                (JSR)

8   CBS INTERACTIVE INC.,

9                               DEFENDANT.
    ----------------------------------------X
10

11                      DATE: January 10, 2019

12                      TIME: 9:53 A.M.

13

14              VIDEOTAPED DEPOSITION of the

15      Plaintiff, STEVE SANDS, taken by the

16      Defendant, pursuant to a Notice and to the

17      Federal Rules of Civil Procedure, held at

18      the offices of Cowan, DeBaets, Abrahams &

19      Sheppard, LLP, 41 Madison Avenue, New York,

20      New York 10010, before Suzanne Pastor, a

21      Notary Public of the State of New York.

22

23

24

25

```
 1                         S. SANDS
 2    little louder.
 3         Q.     Sure.  Did you meet with your
 4    lawyer prior to this deposition for
 5    purposes of preparing for this deposition?
 6         A.     No.
 7         Q.     Did you review any documents
 8    prior to the deposition today?
 9         A.     Did I reveal any documents?
10         Q.     Review any documents.
11         A.     Just the documents that you
12    requested that I needed to provide.
13         Q.     Do you recall any more
14    specifics about those documents?
15         A.     No.
16         Q.     Did you bring them with you?
17         A.     I didn't bring them with me.
18    I --
19         Q.     Okay.  Do you know which
20    photographs are at issue in this lawsuit?
21         A.     I believe this is Benedict
22    Cumberbatch.
23         Q.     We'll go over this --
24         A.     Filming a Marvel show.
25         Q.     We'll go over this in a little
```

```
 1                      S. SANDS
 2          Q.     Are these film or digital?
 3          A.     Digital.
 4          Q.     Did you search any memory cards
 5     where the photos you claim in this case
 6     might have been stored?
 7          A.     Every time -- there's no sense
 8     to search a memory card because all the
 9     data is gone the day I shoot it.
10          Q.     Where do you transfer the files
11     once --
12          A.     Onto a hard drive, as I already
13     said.
14          Q.     Okay, that's where they go once
15     you've finished taking the photos?
16          A.     Mm-hmm.
17          Q.     How do you store them?  Is it
18     by day, is it by person in the shot, is it
19     by production?  How do you store your --
20     categorize --
21          A.     By name, by production.
22          Q.     By name --
23          A.     By name of production and by
24     name of the talent.
25          Q.     Do you retain copies of all the
```

```
 1                    S. SANDS
 2   photos that you've taken in the past, say,
 3   three years?
 4        A.    Yeah, I should.
 5        Q.    You should, you mean you
 6   believe you do or you should because
 7   everybody should?
 8        A.    Because I copy them onto my --
 9   I use due diligence to put them on several
10   hard drives, yes.
11        Q.    I just want to get a little bit
12   of sense of your background in photography
13   generally.  Can we start with your
14   education.  Did you finish high school?
15        A.    Yes.
16        Q.    Did you attend college?
17        A.    Yes.
18        Q.    Where did you go to college?
19        A.    NYU.
20        Q.    And did you get a degree?
21        A.    No.
22        Q.    How many years were you at NYU?
23        A.    Three and a half.
24        Q.    Close but not quite, huh?
25              Did you have a major or a
```

```
 1                    S. SANDS
 2          Q.    Are you aware that CBS has
 3     licensed your photos --
 4                MS. LACKMAN:  Mr. Freeman, I
 5     would ask you not to laugh.
 6          A.    Not these photos.  That's for
 7     sure.
 8          Q.    Has CBS licensed photos from
 9     you before?
10          A.    I don't believe they've
11     licensed it directly.  As a matter of fact,
12     I remember ten years ago they actually
13     stole a picture of mine and they were
14     supposed to pay me for it.  And then their
15     lawyer at the time went on vacation for a
16     very long period of time.  That photo was
17     Ann Hathaway I believe with a very, very
18     irregular tan.  And they just helped
19     themselves -- oh, no, it wasn't that photo.
20     It was Beyonce -- let's make a note of this
21     because that will come up.  This is ten
22     years ago and this is a photo of Beyonce as
23     a police officer.  Very exclusive.
24     Everybody was paying $3,000 for that photo
25     and CBS just helped themselves to it.
```

1                     S. SANDS
2    did paid you?
3         A.    I've certainly had situations
4    where they paid me, yes.  Some people have
5    done the honorable thing.
6         Q.    Did you contact my client when
7    you first learned about the photos at issue
8    in this case?
9         A.    Probably not.
10        Q.    Why not?
11        A.    Because there's so many thieves
12   out there, I have to work out a different
13   model when they get caught.
14        Q.    What model is that?
15        A.    Liebowitz, Inc.
16             MS. LACKMAN:  Mr. Freeman, do
17             we need to take a -- do we need to
18             reschedule this deposition or
19             something until you get your act
20             together?  I'm trying to keep this on
21             track and focus, and I'm really
22             interested in what your client has to
23             say.
24        A.    Don't worry about him.  I'm
25   focussed and I'm coherent and it is funny.

```
 1                       S. SANDS
 2          A.    I don't know.  Enough where I
 3    can find a lot of infractions on my own.
 4          Q.    Did you find any -- any of the
 5    cases that you brought against CBS
 6    Interactive, did you find the photos on
 7    your own?
 8          A.    I don't know.  Probably not.
 9          Q.    Who finds --
10          A.    I don't remember.
11          Q.    Who found these photos for you?
12          A.    Who what?
13          Q.    Who found the photos --
14          A.    I don't know exactly who found
15    them.  It wasn't me.
16          Q.    Do you recall when you first
17    heard about them?
18          A.    No.
19          Q.    Was it --
20          A.    It was two years ago.
21          Q.    When you heard about it?
22          A.    When -- well, I'm assuming it
23    was two years ago because that's when we
24    filed, so.  That's when I took the photo.
25          Q.    Do you remember when you
```

```
1                    S. SANDS
2    heard --
3         A.    Two and a half years ago.
4         Q.    Do you remember when you first
5    learned about CBS Interactive using the
6    photos?
7         A.    As I said, I don't remember
8    because there are so many thieves out
9    there, it's hard to really keep track.
10        Q.    You can look back at the photos
11   in the complaint if you'd like if that
12   helps.  Was it more than a year ago?
13        A.    I have no idea.  I would -- you
14   don't want me making assumptions, but I
15   will note something as an assumption.  I
16   will assume if the way things go, if it was
17   2016 in October when I took the picture, it
18   was probably stolen somewhere within three
19   months of 2016.  That's when most of the
20   thieves usually steal things.
21        Q.    My question was when did you
22   first learn about the thief?
23        A.    Oh, I don't remember.  I told
24   you that.
25        Q.    But it was a while ago.
```

```
 1                    S. SANDS
 2        Q.    Their job is to find your
 3   photos?
 4        A.    Their job is to secure my
 5   rights.
 6        Q.    Do you give them your
 7   photographs routinely so they can search
 8   for uses?
 9        A.    I certainly -- just as I do my
10   agents, I certainly let everybody who is
11   associated with my work know what I'm up to
12   on a regular basis.
13        Q.    Well, how would they know that
14   a particular photograph was yours?  How
15   would they know to search for it?
16        A.    Because I probably -- what I
17   usually do is I send it to everybody.  I
18   have a mass FTP -- as I told you, I have a
19   mass FTP distribution network.  And every
20   time I shoot something I send it out.
21        Q.    Who do you send it to?
22        A.    The agents, as we already
23   discussed, and Liebowitz Law Firm.
24        Q.    Anybody else?
25        A.    Sometimes it's -- no, that's
```

1                          S. SANDS
2    worthless on a Red Carpet.  Because Red
3    Carpet photos all look the same and there's
4    no creativity involved.  And I never wanted
5    to do it.  I just did it as filler.
6         Q.    You say there's no creativity
7    involved, what do you mean?
8         A.    What?
9         Q.    When you say there's no
10   creativity involved, what do you mean?
11        A.    I could teach -- I could train
12   you for five minutes how to do a Red Carpet
13   photo with your cellphone.  I could train a
14   monkey how to do with photo with the
15   cellphone.  And it's actually been done.
16   National Geographic taught a monkey how to
17   take pictures and it wound up being on a
18   cover.  And the monkey took a damn good
19   picture, too.
20              In other words, the person goes
21   on the Red Carpet and they just stand, they
22   look in your camera and you snap a picture.
23   It's nothing like what I shoot with
24   expressions and body positioning and
25   background.  Background is the most

```
 1                        S. SANDS
 2    important thing in a photo.
 3          Q.     Do you position -- the photos
 4    that you shoot, do you position the action?
 5          A.     No.  Sometimes I do, sometimes
 6    I don't.  But I definitely will pick an
 7    angle, like one of the photos of Jon
 8    Bernthal had the New York skyline.  And
 9    that wasn't one of their angles that they
10    used.  I wanted to get a photo of just him
11    with the New York skyline because he's a
12    New York action hero and I always like to
13    get -- the environment is very important.
14    Many times the environment is just as
15    important as the foreground, meaning the
16    talent.
17          Q.     And do you have any involvement
18    in picking the environment?
19          A.     Absolutely none.
20          Q.     Okay, then we'll come back to
21    this particular topic a little bit later.
22                 I believe before the break you
23    also mentioned that these photos were
24    popular, is that right?  The photos in the
25    set.
```

1                       S. SANDS

2          A.    And nor did I do any check as

3    you maintained before this.  As I said, I

4    thought this was a Benedict Cumberbatch

5    photo, but that's old business.

6          Q.    Right.  So when you said too

7    many to count, too many thieves, do you

8    mean like we're talking millions, thousands

9    of people?

10         A.    No, no.  We're just talking

11   about a lot.

12         Q.    What is a lot to you?

13         A.    What happens when people do do

14   that, whether it be bloggers, Instagramers,

15   websites, corporations, the problem is

16   whoever runs it first should be paying the

17   most money.  And many a times, if I send

18   the photos out right away, and that's a

19   "if," and I don't know what I did with

20   Bernthal, but if I send it out right away

21   at night, most of the thieves will be fans

22   and they'll pick it up and they'll steal

23   it.  And it will be up there first thing in

24   the morning.

25                  And what happens is the big

```
1                        S. SANDS
2     paying publications, like People Magazine,
3     all of a sudden they go Steve, it's not
4     exclusive anymore, it's all over the
5     internet.  And I get nothing out of that.
6          Q.    Okay, so --
7          A.    What it does is it reduces the
8     value where I cannot ask or command $3,000
9     per picture anymore because it's already
10    been seen.
11         Q.    Can you name --
12         A.    This is why we have to
13    discourage copyright theft.  This is why we
14    have laws that seem to be ignored.  And I
15    know about these laws and I spend time to
16    copyright, or have them -- I have people
17    copyrighting them for a reason.  The
18    copyright office exists for a reason.  All
19    this mumbo-jumbo exists for a reason.
20         Q.    And what's that reason?
21         A.    So people don't -- so if people
22    steal a photograph, they have to compensate
23    the people who actually take their time to
24    go through this.  But I think I'm going off
25    track.
```

```
 1                    S. SANDS
 2    my Punisher photos, my Jessica Jones
 3    photos, Naomi Kwiatkowski photos, my Donald
 4    Trump photos.  I have no idea because
 5    that's a lot of photos that I do on a
 6    regular basis.
 7         Q.    Right, but you know -- you said
 8    that you saw a lot of thieves for The
 9    Punisher photos.  Do you remember when you
10    became aware --
11         A.    From two years ago I'm not
12    going to remember who they were.
13         Q.    No, but do you remember around
14    when you saw this, the thieves?
15         A.    I just said about two years
16    ago.  It's usually after the photos were
17    taken.  Remember, I'm not the only one that
18    looks for these things, but I'm a hands-on
19    person and I like to see -- I like to help
20    my own cause.
21         Q.    When you say your own cause,
22    what do you mean by that?
23         A.    This is my cause.
24         Q.    What is your cause?
25         A.    Getting compensation for the
```

```
 1                   S. SANDS
 2        Q.    What's the basis for your
 3   belief?
 4        A.    When I go on Pacer and I see
 5   all these lawsuits against these
 6   corporations and I see multitudes of the
 7   same infractors, it's just a reasonable
 8   assumption that this doesn't happen
 9   accidentally.  And I'm not just talking
10   about me.
11        Q.    How many photographs do you
12   believe the media uses on a yearly basis?
13   Licensed photographs.
14        A.    My photographs or in general?
15        Q.    Just general.
16        A.    I have no idea.
17        Q.    Millions?
18        A.    Ask your client.  I have no
19   idea.
20        Q.    Are you aware of any instance
21   where a media company was sued for a
22   photograph that they actually licensed?
23        A.    No, but I do know many media
24   companies -- for example, when CBS had that
25   Ocasio Cortez interview and people started
```

```
1                         S. SANDS
2      posting it, CBS's attorneys as I believe
3      would call them to say that this is
4      intellectual property and you have to take
5      it down.  That I do know.  And --
6            Q.    But you're not aware --
7            A.    Any time CBS gets some
8      exclusive material, they will make damn
9      well sure that their license is protected.
10           Q.    We're going to strike that
11     whole answer.
12                 Are you aware of any instance
13     where a media company was sued for a
14     photograph that it turned out they had
15     actually licensed?
16           A.    I'm sure it happens.  Not with
17     me.
18           Q.    Never with you.
19           A.    Never with me.
20           Q.    Are you aware that your law
21     firm has on multiple occasions sued media
22     companies for uses of photographs that were
23     in fact licensed?
24           A.    Does this have something to do
25     with me?
```

```
 1                       S. SANDS
 2    else that has -- I only care about my
 3    photos and CBS Interactive.
 4           Q.    Well, I care about getting
 5    information from you, and I care about you
 6    answering my questions.
 7           A.    How am I supposed to know what
 8    goes on in Liebowitz Law Firm.
 9           Q.    You're supposed to say yes, no
10    or I don't know is sufficient.
11           A.    I already said that but you
12    keep harping on something.  Now I'm telling
13    you, how am I supposed to know what goes on
14    in a law firm?  I'm not an employee.
15           Q.    I'm not asking you that you are
16    supposed to know.  I'm asking whether you
17    do know.  "I don't know" is a fine answer
18    and then we can move on.
19           A.    I already told you I didn't but
20    then you keep asking me more questions
21    thinking you're going to pull something out
22    of me.  I have no idea what goes on in
23    their law firm.
24           Q.    Period, that's all I need.  I
25    don't need you to clarify.  The thing is
```

```
 1                    S. SANDS
 2    Punisher photos were used by lots of
 3    thieves I believe.  Do you know whether The
 4    Punisher photos were licensed by anybody?
 5         A.    That's why I have people to do
 6    that.
 7         Q.    So you don't know if they were
 8    or not?  Did any single person license
 9    those photographs, to your knowledge?
10         A.    No.  As I stated earlier, I
11    look at my -- many a time I look at my
12    sales reports and they don't -- a lot of
13    them don't come in until a regular basis.
14    And if I see things that look like they
15    were stolen, then I inquire further.
16         Q.    You inquire --
17         A.    But I don't know who licensed
18    what.
19         Q.    When you say you inquire
20    further, what do you mean?  Who are you
21    inquiring to?
22         A.    I already told you that.  If I
23    see a photo that doesn't have a credit,
24    that raises a flag, and then I look
25    further.  Sometimes I call the agency first
```

```
 1                      S. SANDS
 2   to see did you license a photo.  Sometimes
 3   I don't.  And then when I use my due
 4   diligence, if I find something that looks
 5   suspect, then, as I said, I hand it over to
 6   Liebowitz Law Firm.
 7          Q.    Did you inquire in this
 8   circumstance with the agency whether -- did
 9   you inquire whether CBS Interactive had
10   licensed --
11          A.    I'm sorry?
12          Q.    Did you inquire in this
13   instance with your agency to find out
14   whether the photos that CBS Interactive
15   used were licensed?
16          A.    I already said no.
17          Q.    You didn't ask them?
18          A.    No.
19          Q.    Okay --
20          A.    But as I said, as I said
21   earlier, you want to nip this in the bud,
22   if you're alluding that CBS licensed them,
23   tell me right now and that will save us a
24   lot of time and energy.  But I think you're
25   just fishing, so continue.  Because I don't
```

```
1                        S. SANDS
2     work.  Maybe when I'm dead I won't care.
3     That's a maybe.
4          Q.    And you believe you should be
5     compensated for this work --
6          A.    For any work I do.
7          Q.    And in what amount?
8          A.    Whatever amount I feel
9     appropriate at the time.
10         Q.    So the value of a photo changes
11    depending on what?
12         A.    Of course it does.
13         Q.    What does it --
14         A.    We're talking about these
15    photos.
16         Q.    Yes.
17         A.    Jon Bernthal did not have a
18    beard on The Punisher.  This was the first
19    time he was seen with a beard.  I barely
20    even recognized him when I first saw him.
21    So what that means, when an actor is in
22    costume and when he had a beard, it was a
23    temporary thing, and I'm not going to go
24    giving plot lines and stuff, but the beard
25    was an important thing because it only
```

```
 1                    S. SANDS
 2    lasted a couple scenes.  I was the first
 3    one who had it.
 4                    And that's what the comic book
 5    fans want to see, how he looks next.  And
 6    that was exclusive.  Got him with the
 7    beard.
 8                    Those are my photos, whoever
 9    got those photos, nobody else had them.
10    And I don't believe even Marvel had a
11    photographer there that day.  So even
12    Marvel didn't have the photos of that.  So
13    that means they're more valuable.
14        Q.    There was no other photographer
15    that took photos that day?
16        A.    There's always photographers.
17    There's always somebody with a cellphone.
18    I believe that one photographer was there.
19    But these are my photos.  I can't talk
20    about other people's photos.  I can talk
21    about my photos.
22        Q.    Of course.  You can also talk
23    about your experience in taking the photos.
24    And so that's why --
25        A.    I only know about me.  I only
```

```
 1                    S. SANDS
 2   the value of the photos of Jon Bernthal
 3   came from the fact that he had a beard and
 4   that's what made him --
 5        A.     Absolutely.  And I do know this
 6   is day 1 of The Punisher as opposed to when
 7   he was on Daredevil.  That's more important
 8   because they actually gave him his own
 9   show.  And Marvel is a little secretive
10   about stuff.  And I don't believe it was
11   even out there that he had his own show.
12   Marvel and Netflix likes to be very
13   secretive.
14        Q.     How did you find out about
15   this?
16        A.     I have lots of connections.
17        Q.     Do you have a connection at
18   Marvel?
19        A.     Probably not.  They're all
20   NDA'd.
21        Q.     Did you speak with anybody
22   about coming to the set?
23        A.     To gain permission?
24        Q.     Yes.
25        A.     I never do.
```

```
 1                    S. SANDS
 2   plaintiff is a custodian of documents.  Do
 3   you see that?
 4        A.    Some of the documents.
 5        Q.    Right, okay, well, you're
 6   anticipating my question, which is which
 7   documents did you have in this case?
 8        A.    Well, I did not have the
 9   copyright registration materials or the
10   license related documentation.  That's
11   whoever my staff was that would have that.
12   Meaning Liebowitz Law Firm or my sub
13   agents.
14              My past history of being sued
15   for copyright infringement, I have never
16   been sued for copyright infringement.
17   Actually, I don't even remember that
18   question but that's okay.  I assume I
19   glanced over it and I've never been sued.
20   It doesn't even apply to me.
21        Q.    Well, that's why it says
22   defendant.  You're not the defendant in
23   this case.
24        A.    Oh.  This is my answer though.
25   These are my questions.  This is something
```

```
 1                    S. SANDS
 2    the sole copyright holder.  Nor do I sign
 3    over my copyright to any agency.
 4         Q.    Mr. Sands, you gotta answer the
 5    question.  The question is why do you say
 6    that plaintiff's counsel has information?
 7         A.    Because they're the ones who do
 8    the copyright.  I don't know about the
 9    copyright mumbo-jumbo.  And it changes.
10    And it's very complicated.  And they know
11    about that.  That's why they do what they
12    do and that's why I hire them.
13              So of course that's why I would
14    answer that the plaintiff's counsel has
15    that kind of knowledge, because they're the
16    ones who do the copyright.  As I've said
17    four times already.
18         Q.    Do they have --
19         A.    I don't do copyright.  I don't
20    go on the website, nor am I personally
21    registered.  I have people that do that.
22    Just like you, and you work for CBS and CBS
23    didn't even bother showing up themselves.
24    So I have my representative, you have --
25    CBS has their representative.  And I can
```

```
 1                    S. SANDS
 2        A.    Did I check what?
 3        Q.    Did you check the copies of the
 4   photos that were submitted to the copyright
 5   office before --
 6        A.    I absolutely did because I
 7   wanted to verify -- that is one thing I
 8   always do.  I make sure that each photo is
 9   my photo, and I cross-reference that with
10   my computer.  And whatever photos I can
11   find at the time.  And I know these are
12   exactly my photos, and these are exactly my
13   angles.  And none of them have credit.
14        Q.    So there is correspondence
15   between you and your lawyers pertaining to
16   the application that's attached to the
17   complaint?
18        A.    I don't know what -- a lot of
19   my correspondence is in phone calls.  So
20   I'm a phone call person.  As I told you,
21   I'm not a texter, I'm not a social media
22   person.  The only time I really like to use
23   e-mail is just data.
24        Q.    So did they send you -- did
25   your law firm send you a copy of the
```

```
 1                     S. SANDS
 2    application and the proposed deposits
 3    before --
 4         A.    Probably not.  Usually what I
 5    do is I send the photos to them and then
 6    they handle it.
 7         Q.    Okay, so --
 8         A.    I think that's client-attorney
 9    privilege and I don't really -- I'm not
10    really authoritative enough to answer that
11    question.  And it's client-attorney
12    privilege so I'd really like to pass on any
13    questions having to do with the business of
14    my lawyer because I just don't know.  And
15    if I did know, it would be protected.
16         Q.    Your lawyer should be making
17    privilege objections, not you.
18         A.    Okay.
19         Q.    My question is do you see --
20         A.    I just like to make things
21    smoother.
22         Q.    I would disagree with your
23    characterization.  But did you see the
24    application --
25         A.    No.
```

1                      S. SANDS
2          Q.    -- and the pro -- okay, no.
3     Thank you, that's a good answer.
4                Do you select which photos to
5     register?  So for example --
6          A.     Everything I shoot --
7          Q.     You register everything you
8     shoot?
9          A.     Everything.
10         Q.     How many photos, roughly, did
11    you shoot on the set of The Punisher that
12    day?
13         A.     I have no idea.  It was a
14    couple hours.  I could say a hundred, maybe
15    300 raw images.  And usually, and I can't
16    be specific, but usually -- this is what I
17    usually do.  If it's a long day, I usually
18    whittle it down to maybe 20 images.  And
19    those are the ones that I copyright because
20    nothing really happens to the ones that I
21    don't process.  Every photo gets processed.
22    They get captioned on an IT PC captioning,
23    metadata and they get titled.
24                And those are the photos that
25    we can only talk about because I will

```
 1                        S. SANDS
 2    not -- I'm not going to send every -- I'm
 3    not going to send things that aren't
 4    necessary because those photos that we're
 5    talking about, the raw photos are in my
 6    computer and my computer only.  Unless
 7    somebody hacks my computer, that's another
 8    story.
 9         Q.   Okay, so in this -- so you have
10    a couple -- if you have a couple hundred
11    photos maybe and you whittle it down to 20
12    for example, you could talk about this
13    generally or in this specific case --
14         A.    Generally, and I'm sure this
15    was no different.
16         Q.   That's helpful.  Do you send
17    the same photos to the licensing agency
18    that you send to your lawyers to register?
19         A.   Oh, yes.
20         Q.   So you don't ever send more to
21    the agency than you do for registration?
22         A.    It's usually the same photos
23    that go everywhere.
24         Q.   Do you know if it was any
25    different in this case?
```

```
 1                   S. SANDS
 2   lawsuit?
 3        A.    Yes.  And nothing came up.
 4   Nothing came up, right?  So nothing came
 5   up, but everything would be within the date
 6   that I shot it.
 7        Q.    Okay, let's turn to page 5 of
 8   this document in front of you.  Not that
 9   one.  Exhibit 5.
10        A.    Would that be in Exhibit A?
11        Q.    No.  This is the smaller one
12   you were looking at just a minute ago.  It
13   should have a number 5 on the front.  So
14   it's page 5.
15        A.    Page 5?
16        Q.    Yes.
17        A.    Okay.
18        Q.    Do you see the chart at the top
19   of page 5?
20        A.    Right.
21        Q.    And do you see the first line
22   where there's a reference, estimated fair
23   market value of each photograph?  Do you
24   see that?
25        A.    Correct.
```

1                           S. SANDS

2           Q.     And it says 1500 to $2500.  Do

3      you see that?

4           A.     Correct.  Estimated.

5           Q.     Estimated, right.  Why do you

6      conclude that this is the estimate for the

7      value of each photograph?

8           A.     Because as I told you earlier,

9      that's what I usually ask.  And sometimes

10     it's more.  Like if I get photo of Gwyneth

11     Paltrow with her baby that's exclusive and

12     nobody else has, it goes up substantially

13     to what I request.

14          Q.     Are you aware whether anyone

15     else had photos taken on the set of The

16     Punisher that day?

17          A.     I don't really know or care

18     what anybody else had because I know what I

19     had.  And if they want to buy my pictures,

20     this is what they have to pay.

21          Q.     So exclusive means that it's --

22     the exclusive refers to who gets it as a

23     licensee rather than it's exclusive like

24     there's no other photos like this?

25          A.     It can apply to both.  But

1                          S. SANDS

2           Q.      Mm-hmm.

3           A.      And if those two answers are

4    correct, that's assuming that they call,

5    unlike CBS Interactive, but then they're

6    willing to pay the money and they get me

7    that photo right away, we want to run it

8    right now so we get all the first looks.

9           Q.      I see, okay.  Do you --

10          A.      I like to give examples.  Just

11   like the Ocasio -- the CBS Ocasio interview

12   --

13          Q.      Hold on.  We're never going to

14   get through this.  I gotcha.

15          A.      Okay, thank you.

16          Q.      If I move on it's because I

17   understand your answer.

18          A.      Please cut short any time you

19   want.

20          Q.      So when you say the estimated

21   fair market value of each photograph is

22   $1500 to $2500, does that mean for an

23   exclusive?

24          A.      It's just a good place to

25   start.  And usually of course it has to do

```
 1                    S. SANDS
 2   with exclusives.  I don't think I would
 3   have the nerve if 20 photographers had the
 4   same photo I had to ask for $20,000.
 5   That's why I don't do red carpets and stuff
 6   like that.  I like to go where there's not
 7   a lot of people with cameras.
 8        Q.    So this range then, does this
 9   fair market value, does this assume that
10   this is the rate that someone -- if some
11   website said we want to publish this first,
12   is this the rate that you would charge?
13        A.    Yes.  That's a good place to
14   start.  In other words, what are you going
15   to do for me.  Are you going to -- what are
16   you going to do for me?  I'm giving you
17   something that I worked hard for and I want
18   you to get it right away.  I want you to be
19   the first one to run it.  What do I get in
20   return.  Do I get to use your name, do I
21   get invited to something that you have.
22   We're kind of a partnership here.
23        Q.    So when you say it's a good
24   place to start, if someone said I'll give
25   you $750 and premiere access to my next
```

```
 1                    S. SANDS
 2   event, would that be -- is that what you
 3   mean by "a good place to start"?
 4         A.    Yes.
 5         Q.    So the numbers wouldn't
 6   necessarily go up.
 7         A.    That's why it depends on who
 8   you're talking to.  But I have to get
 9   something out of it for me to make that
10   decision.
11         Q.    Were the photographs at issue
12   in this case, do you know if they were ever
13   each licensed on an individual basis for
14   1,500 to $2,000?
15         A.    I have no idea.  Probably not.
16   But I would have no idea.
17         Q.    Then what's your conclusion
18   that this is the fair market value of each
19   photograph?
20         A.    Because that's what I usually
21   ask.  And then whoever calls -- there's
22   some people I don't want to sell to.  I
23   don't like to sell the scandal publications
24   like the Enquirer because if it's an actor
25   that I like, I don't want them running
```

```
 1                    S. SANDS
 2   things about him or her.  I don't like
 3   scandal publications because everything
 4   they print is not true.
 5        Q.    Did you ever tell any of your
 6   licensing agents that they were not
 7   permitted to license to a particular --
 8        A.    I have certainly told -- yes,
 9   absolutely.  I have told many of the people
10   who and where they're supposed to license
11   to.
12        Q.    Do you recall ever -- these
13   requests that you described, would you make
14   these on a blanket basis or would these be
15   photo-by-photo?
16        A.    Sometimes it's a blanket basis
17   and sometimes it's -- if somebody -- let's
18   say People Magazine says we're paying you
19   $3,000 for exclusive rights to this photo,
20   then I immediately call on the phone,
21   because you want to make sure people know
22   what you're doing, you want to call them
23   and tell them you can't run these photos
24   now because I just sold it.
25        Q.    Did you ever -- can you recall
```

```
1                      S. SANDS
2    any online only publication that ever
3    licensed a set of photographs for 1,500 to
4    2,500 each?
5         A.     Probably not.
6         Q.     So in your experience, this is
7    your opening offer?
8         A.     This is the print.  And a lot
9    of times they're throwing -- you're
10   throwing in online for the big money in the
11   print anyway.
12        Q.     So what do you think is a fair
13   market value if it was just online?
14        A.     You know, online is -- I'd
15   rather it not go online.  But that's the
16   state of the market right now.  So I'm
17   still going to ask for what I ask for.  I'm
18   not going to make -- I'm not going to give
19   my photos away for nothing.
20        Q.     For online only use, do you
21   know the largest number you've ever
22   received for --
23        A.     No I don't, because online is
24   very minor to me.  And I don't really --
25   there are too many of them and I don't
```

```
 1                    S. SANDS
 2   really care about dealing with them.  I'd
 3   rather not even waste my time bothering
 4   with them.
 5        Q.    So the price is basically --
 6   the price you're seeking is basically --
 7        A.    I don't change my prices unless
 8   somebody calls me.  And then we'll talk.
 9   What do you have to offer me.
10        Q.    So the price you're seeking is
11   basically print and you throw in the online
12   use as part of that package?
13        A.    I'm open to anybody who wants
14   to call me and use my pictures or my
15   agents.  But they have to call.  They have
16   to inquire.
17        Q.    So you've never directly
18   licensed a photo for online use only?
19        A.    I'm sure I have in the past.
20   But do I remember it, it's so minor to me.
21   And I have not -- let's be specific.  To
22   The Punisher, no, I do not recall selling
23   any images on my own to the Punisher, of
24   The Punisher.
25        Q.    Funny enough, we've covered
```

```
1                       S. SANDS
2    Google isn't even accurate.  But it's a
3    good place to start.
4         Q.    Is this one of those things
5    that you've logged into once in your life?
6         A.    No.  On a regular basis but I
7    can't tell you how many times.  It's just
8    when the whim hits me.  I will tell you I'm
9    probably not even going do it now to look
10   at The Punisher photos because I think
11   we're all set on what's mine and what
12   isn't.
13        Q.    What do you mean by that?
14        A.    I'm not going to look up,
15   because I think it's pretty accurate on
16   what's going on with these and that CBS
17   took my pictures.
18        Q.    So you're not going to search
19   for any other Punisher --
20        A.    Even today after we break
21   because I think we're all -- I'm confident
22   that we're all set on all the particulars.
23        Q.    Okay, so you're not going to
24   search for any other -- I think you said
25   something like there were countless thieves
```

```
 1                        S. SANDS
 2    for these photos.  You're not going to
 3    search to see whatever thieves might be out
 4    there?
 5         A.    I don't have to because I have
 6    people that do this for me.  Just like
 7    you're not doing this because you have
 8    people typing this out.  And you're not
 9    gonna go to the courtroom and file.  You're
10    gonna have people that do that for you.
11    Right?  So I have people that do that as
12    well.  And you've dealt with them quite
13    extensively, as I understand.
14         Q.    Well, considering how many
15    lawsuits are filed, it's almost impossible
16    to avoid your lawyers.
17         A.    Not just with me.
18              MS. LACKMAN:  Let's mark as
19         Exhibit 6 -- let's not mark as
20         Exhibit 6.
21         Q.    Forgive me if I've covered some
22    of this stuff already, and you can tell me
23    if I have.  Are you assigned -- does anyone
24    ever assign you a job to go take, or do you
25    find this stuff on your own?
```

```
 1                      S. SANDS
 2          Q.     There are more things that are
 3     relevant to the case.  Your lawyer has also
 4     made other cases involving my client
 5     relevant.  And I also want to understand
 6     the general process so I can establish a
 7     foundation.
 8          A.     It's the same thing.  Very few
 9     producers, unless it's an independent show,
10     can actually give me permission.  But I am
11     known as a fighter and I am very much
12     against corporate bullying.  In other
13     words, to translate, when I show up on a
14     set and they don't want me there, they try
15     to get these big security guards to try to
16     intimidate you.  As a matter of fact, CBS
17     is very good at that with the few shows
18     that they have.  I'll just throw that in
19     there.  I'm thinking of something right now
20     that was pulled on me at Madame Secretary
21     since you mentioned it.  So no.
22               But what they can do is the
23     producer can say it's not worth it to throw
24     him out, leave him alone.  And that gives
25     them, when they have to answer to the
```

```
 1                        S. SANDS
 2   production company, meaning CBS, or in this
 3   case Netflix, why did Steve Sands get the
 4   set for these photos, we can't legally stop
 5   him.  Does that answer that question?
 6        Q.    Not exactly, but --
 7        A.    In other words, they don't take
 8   responsibility for me being there because
 9   they can't and they don't.
10        Q.    But the answer to whether you
11   affirmatively get permission --
12        A.    I just said no.  They cannot
13   give me permission.
14        Q.    Whether they can or can't, do
15   you ever -- sometimes people ask for
16   things, not because they have to but
17   because it's polite.
18        A.    I'm not those people.  I don't
19   ask.  I just show up.
20        Q.    Have you ever --
21        A.    It's a waste of time.
22        Q.    Have you ever said I would like
23   to be the exclusive photographer on this
24   set, can you please ensure that nobody else
25   gets on the set?
```

```
 1                    S. SANDS
 2        A.    You know, I would -- no,
 3   absolutely not.  First of all, I don't have
 4   the authority to do so.  I'm just a
 5   photographer.
 6              Even if somebody was willing to
 7   do that, I wouldn't even ask because I'm a
 8   First Amendment purist, and if something is
 9   shooting in a public area and this is my
10   personal photo shoot, I'd make sure it was
11   contained in a place where they didn't --
12   weren't able to get the photo in the first
13   place.  I don't believe in bullying people
14   to stop them; I don't have the right to do
15   that.
16        Q.    Okay, do you believe that what
17   a director does in placing actors in
18   locations and telling them where to walk
19   and that sort of thing, do you believe that
20   that is creative?
21        A.    Depends.  It's collaborative.
22   Because usually the director says one thing
23   and the actors do what they want to do
24   anyway.
25        Q.    But do you believe there's some
```

```
 1                        S. SANDS
 2   creativity in that process?
 3        A.    There's some.
 4        Q.    Do you believe you have the
 5   right to capture that creativity and
 6   monetize it?
 7        A.    If it's on a public street I
 8   absolutely do have that right.  There's not
 9   one shred of case law that says otherwise.
10   And believe me, I've read all the cases.
11        Q.    Has anyone ever said to you,
12   you know, we would prefer to issue stills
13   from the day and not have -- we invested in
14   this --
15        A.    They used to, but remember, I'm
16   known as not taking any bullshit.  And
17   that's bullshit.  Because that doesn't
18   apply to me because -- and they don't
19   anyway.  They don't.  CBS certainly
20   doesn't.  But it doesn't apply to me.
21        Q.    Do you believe -- do you
22   understand that people who make television
23   shows and movies invest money in filming
24   and creating something for the public to
25   enjoy?
```

1                    S. SANDS
2         A.    If they don't want me taking
3    pictures, they should invest more money and
4    shoot in Steiner Studios because I have a
5    right to take any photo that I want.  And
6    you know what?  We're talking about Marvel
7    now, we're not talking about CBS.  CBS's
8    rules might be a little different depending
9    upon who runs PR.  And sometimes it's like
10   we don't want photos to get out, and CBS
11   definitely doesn't, they want to control
12   everything.  They want to control their Red
13   Carpet.  You should see the names of the
14   people they put on the Red Carpet.
15        Q.    Have you ever accessed a closed
16   set before?
17        A.    Every set is a closed set.  But
18   is it a legally closed set?
19        Q.    Well, have you ever accessed a
20   set that was not in a public space?
21        A.    I used to be hired.  I used to
22   be in the union and I used to access those
23   things plenty of times.  But we're talking
24   about Marvel now.  No, Marvel isn't a
25   public space and this particular image was

```
 1                         S. SANDS
 2    with publicists.  And I don't like people
 3    telling me where the good shot is.  I don't
 4    like people telling me what I can shoot.
 5    Sometimes you're very restricted as the set
 6    photographer.
 7         Q.    In your experience, are set
 8    photographers paid to shoot?
 9         A.    Yeah, you're paid about $3,000
10    a week.
11         Q.    So the set photographer --
12    okay.
13               Have you ever been arrested for
14    accessing television or --
15         A.    Oh, yes, I have.  But not on
16    The Punisher.
17         Q.    How many times?
18         A.    Several.
19         Q.    Several.  More than ten?
20         A.    No.
21         Q.    More than five?
22         A.    Two or three.  That's one of
23    the really evil things.  And I always
24    litigate on that.  And I've had several
25    decisions favorable to me against the City
```

```
1                        S. SANDS
2         Q.    That's one issue in the case
3    with a lot of issues.
4         A.    I will just assume that we're
5    here because they didn't license the photo.
6         Q.    What software do you use for
7    your -- do you edit your photos at all?
8         A.    Sometimes I do.
9         Q.    Did you do that in this case?
10        A.    I usually use Photo Mechanic
11   and PhotoShop.  That's another thing I do
12   that most people don't do, is -- first off,
13   I try to compose in the camera.  And if
14   something -- if there's something I don't
15   like, color shift or something like that,
16   I'll spend hours sometimes altering it.
17              And if it's an actor where
18   there's a shadow, I'm very big on making
19   them look good, so if the lighting is
20   really bad, sometimes I'll correct it in my
21   photo.  Whether I did that with Jon or not,
22   probably not.
23              I really should only answer
24   questions regarding these photographs.
25        Q.    Well, you should answer the
```

```
 1                    S. SANDS
 2    Yeah, I don't remember the name of the
 3    movie but I think I got $5,000.  They
 4    wanted to offer me 500.  I said no, no, no.
 5    If you hire bad photographers when you
 6    should hire me, I'm going to charge you
 7    what needs to be charged.
 8              And I had her backing because
 9    she wasn't going to approve any pictures.
10    So they really had to pay me what I wanted
11    to be paid.
12         Q.    How many photos, do you recall
13    about how many photos you gave them?
14         A.    I think it was only like three
15    photos.  It doesn't really matter.  It was
16    like 20 years ago.  I remember Dakota
17    Fanning was about eight years old when she
18    was in that.
19         Q.    In the past two years how often
20    do you license photographs directly as
21    opposed to through a licensing agency?
22         A.    Honestly, it's a good question.
23    It's been diminishing, especially in the
24    past two years because as I mentioned, not
25    only do they not call you back, they don't
```

```
 1                     S. SANDS
 2    in the past two years have been issued
 3    directly by you as opposed to through a
 4    photo agency?
 5          A.    I have no idea.  I don't keep
 6    records and statistics.  I don't have to.
 7          Q.    But do you have a sense of --
 8          A.    I'm a small business owner.  I
 9    don't really have people to show documents
10    to.
11          Q.    You don't need to make excuses.
12    I understand.  My question is -- I'm trying
13    to get a sense of if you license 200 images
14    a month, I don't know if this is anywhere
15    close, but let's say you license --
16          A.    Myself.
17          Q.    There are licenses for your
18    photos, directly or indirectly, do you have
19    just a rough sense of --
20          A.    What?
21          Q.    Are most of those licenses
22    coming via a photo agency or are most of
23    those licenses coming via you talking
24    directly to the licensing?
25          A.    It's mostly a photo agency.
```

```
 1                      S. SANDS
 2   But as I said, many times I try to sell it
 3   myself either before I take the picture --
 4   I used to call all the time.  And I'm doing
 5   it less and less now.
 6          Q.    When was the last time you
 7   licensed a photo directly yourself?
 8          A.    I don't remember.  That's how
 9   bad it is.
10          Q.    When you shoot on film or TV
11   sets, do you stand next to the camera or --
12   how do you --
13          A.    I stand wherever I want to
14   stand, as long as I'm not interfering with
15   the production.  It depends.
16          Q.    Right.  So if there's a screen
17   shot from a movie that gets out there, a
18   daily or something, a publicity still --
19          A.    I don't know about that.
20          Q.    -- how do you know -- when you
21   see it, how would you know if it's yours or
22   not?
23          A.    Because as I stated before,
24   when a photo is in question, I look at the
25   photo and then I go on my computer and look
```

```
 1                        S. SANDS
 2     for the photos that I have sent out.
 3     And -- or I use Liebowitz Law Firm's cloud
 4     as a means not just for copyright, as a
 5     means of storing my images because hard
 6     drives fail.  And I like to have my images
 7     on several hard drives at home, and I also
 8     like to have them on other people who have
 9     servers and means to protect them.  Just in
10     case they get lost.  There's a lot of
11     things that get lost nowadays.
12          Q.    Have you ever been in a
13     situation where a photograph was lost or
14     you weren't sure but you thought it was
15     yours?
16          A.    Never.  It's very easy, you
17     just do a layout and you look at the photo
18     and you see mine and you see theirs.  And
19     especially around that time.  Marvel and
20     CBS are not releasing screen shots of
21     anything.  Nothing is getting out.  I am
22     tolerated because they really can't stop
23     me.  And some of the people do like what I
24     do.
25          Q.    So Marvel, Netflix, nobody
```

```
1                        S. SANDS
2    released any stills --
3           A.     Everything is under NDA.
4           Q.     So they never released any to
5    the public --
6           A.     Never.
7           Q.     There were never any press kits
8    or anything like that?
9           A.     Not until a month before the
10   show is going to be released.  And even
11   then it's strictly embargoed.  Just because
12   they make a press kit -- just because they
13   make a press kit, that doesn't mean
14   everybody is allowed to use it.  It means
15   you still have to call Marvel or Netflix
16   for permission.  But that doesn't apply to
17   me because I don't work through them.
18          Q.     Do you ever stand near the film
19   camera just to see what's being filmed?
20          A.     You already asked me that
21   question.
22          Q.     You said yes, sometimes.
23          A.     Sometimes for sure.  But I
24   usually like to get my own angles.  Because
25   sometimes their angles work for them.  If
```

1                      S. SANDS

2    credit and so this is why you're supposed

3    to -- publications are supposed to give

4    credit.

5         Q.    Do you see -- if you flip

6    through the photographs, or the images, do

7    you see at the bottom there's a watermark,

8    there appears to be a watermark?

9         A.    Yeah.   Comingsoon.net.

10   Correct.   On one of them -- several of

11   them.

12        Q.    Yes.

13        A.    Which is pretty incredible

14   because they never took those pictures.

15   Nor were they licensed to them to shoot.

16        Q.    Okay, so the credit then --

17        A.    And certainly CBS had no

18   license to shoot -- to run them.   If they

19   did run them from comingsoon.net.

20        Q.    So when you say there's no

21   credit, you mean that you believe that the

22   credit here is incorrect?

23        A.    I'm sorry?

24        Q.    Would you consider this

25   reference to comingsoon.net to be a credit,

```
 1                        S. SANDS
 2   whether it's correct or not?
 3        A.    It's a credit that they put on
 4   themselves.  And I don't really see what
 5   right they would have to put a watermark on
 6   a photo that they had nothing to do with
 7   it.
 8        Q.    You said they have nothing --
 9        A.    Once again, as I said, that's
10   the arrogance of an internet thief.
11        Q.    When you say it's a photo that
12   they had nothing to do with, what do you
13   mean?
14        A.    They weren't there.
15        Q.    How do you know that it was not
16   licensed from comingsoon.net?
17        A.    Because they can't license my
18   pictures.  Nor should they.
19        Q.    How do you know they can't?
20        A.    Because it's not their photo.
21   They don't have a copyright for it.
22        Q.    Did comingsoon.net have
23   permission to license the photo?
24        A.    I don't know.  As I told you, I
25   don't know who licenses what.  But
```

```
 1                    S. SANDS
 2    comingsoon.net, even if they did, and I
 3    don't believe they did because I think
 4    they're one of the thieves, one of the
 5    serial thieves, but if they did, that
 6    doesn't absolve you from running it.  They
 7    cannot sell it to you.  They don't have the
 8    copyright to do so.  Nobody has the
 9    copyright.  When they buy a picture, they
10    don't buy it, they license it.  That's
11    what's called licensing.
12         Q.    Correct.
13         A.    That's why nobody used the word
14    "buying."  Nobody purchases the photo.
15    They pay for a photo but they're not
16    purchasing it because they don't own it.
17    They license it.
18         Q.    They purchase the right to use
19    it.
20         A.    Or they steal it.  And
21    comingsoon.net, whether they stole it or
22    whether they licensed it, let's be very
23    accurate here, that does not absolve CBS
24    from poaching it from comingsoon.net.  It's
25    still my photo.  It's still not their
```

```
 1                    S. SANDS
 2    photo.  This is one thing --
 3         Q.    Okay --
 4         A.    -- you should instruct your
 5    clients to do.  Instead of paying you
 6    thousands of dollars to fight this --
 7         Q.    Mr. Sands, I don't know what
 8    question this answers, but my question
 9    wasn't should people take things for free
10    or not.  That was not my question.
11         A.    Well, you're intimating it.
12         Q.    I don't think that's an issue
13    in this case.  My question is do you know
14    whether comingsoon.net had permission to
15    use the photo?  And I want --
16         A.    I'm trying to give you
17    information here to help you but I'm going
18    to go more specific.  I have no idea what
19    comingsoon.net does.
20         Q.    Do you have any reason to
21    believe that by virtue of the fact that
22    comingsoon.net used --
23         A.    I don't know because we're not
24    suing them today.
25         Q.    They did not have a license?
```

```
 1                         S. SANDS
 2         Q.    So you took all five of these
 3    photos?
 4         A.    Yes.  To the best of my
 5    knowledge, of course.
 6         Q.    I believe you testified earlier
 7    that you were on the set for about two
 8    hours.
 9         A.    Probably more.
10         Q.    How long?
11         A.    I don't know exactly, but I'll
12    say whether I was shooting -- a lot of
13    times there's sleeping on the set because
14    they take a lot of time, but I would say
15    about two hours with Jon on the set.
16         Q.    Do you recall any wardrobe
17    changes at the time?
18         A.    No.  There were no wardrobe
19    changes, but there was -- it was a hot day.
20    Sometimes he took his jacket off in between
21    takes.
22         Q.    That's all?
23         A.    Yes.
24              MS. LACKMAN:  Let's mark as
25         Exhibit 8 another photo is the only
```

```
 1                    S. SANDS
 2         way I can describe it.
 3              (Whereupon, Color Photo was
 4         marked as Defendant's Exhibit 8 for
 5         identification as of this date by the
 6         Reporter.)
 7         Q.   Mr. Sands, do you recognize
 8    what's been marked as Exhibit 8?
 9         A.   I don't -- I only can remember
10    the photos that I authorized as were
11    stolen.  Whether I recognize this as mine,
12    I have to go to my computer.  Because
13    remember, I use due diligence.  I can't
14    remember every exact photo that's mine or
15    not.
16         Q.   Do you have any other -- would
17    you have any other basis to verify whether
18    this is your photo or not?
19         A.   Not here.
20         Q.   Is there anything --
21         A.   But you know what, this really
22    has nothing to do with the case.
23         Q.   Strike -- stop --
24         A.   This is not one of the photos
25    that I've marked as stolen.
```

```
 1                    S. SANDS
 2        Q.    Stop.
 3        A.    So I have really no knowledge
 4   of this.
 5        Q.    Mr. Sands, I'm going to call
 6   the judge and he will instruct you to
 7   answer my questions.
 8        A.    I am answering your questions.
 9   You're asking me do I recognize this photo.
10   No, I do not.
11        Q.    That's it.
12        A.    And I'm telling you why I don't
13   recognize the photo.
14        Q.    Mr. Sands, that's it.  I don't
15   want to know -- I'm not going to ask you
16   why you don't recognize the photo.  Is
17   there anything about -- anything about
18   photographs that you take where you would
19   say this is my style, the lighting, I
20   recognize the depth, I recognize that I was
21   close, anything like that?
22        A.    In this?  As -- and I also
23   testified, or said at a deposition --
24        Q.    Let me ask the question --
25        A.    -- that I don't control things.
```

```
 1                      S. SANDS
 2    I shoot what I like to shoot.
 3         Q.    So is there anything about what
 4    you see here, the style, the lighting --
 5    I've worked --
 6         A.    I didn't light it.  But do I
 7    like this shot?  Yes.  Would I have taken
 8    it if I saw it, absolutely.
 9         Q.    Do you know who Fameflynet is?
10         A.    Who?
11         Q.    Fameflynet.  Have you heard of
12    them?
13         A.    Who?
14         Q.    Fameflynet.
15         A.    Those are photo agencies.
16         Q.    Are you -- let's mark Exhibit
17    9.
18              (Whereupon, Just Jared Photo
19         was marked as Defendant's Exhibit 9
20         for identification as of this date by
21         the Reporter.)
22         Q.    Have you ever licensed your
23    photos through Fameflynet?
24         A.    Absolutely not.
25         Q.    I'm just showing you --
```

```
 1                     S. SANDS
 2          A.    They're kind of a slimy photo
 3   agency, both of them.  And I think they're
 4   out of business now.
 5          Q.    I'm showing you what's been
 6   marked as Exhibit 9.  If you turn -- have
 7   you seen this article before?
 8          A.    Have I what?
 9          Q.    Have you seen this article
10   before?
11          A.    No.
12          Q.    If you turn to the second page,
13   do you see that?  There's a very -- I know
14   it's somewhat small.  There's a credit
15   there to Fameflynet.  Do you see that?
16          A.    Yeah.  Those probably are not
17   my pictures.  I guess we can say that.
18          Q.    Why can you say that?
19          A.    Because some of them don't look
20   familiar.  But they're too small.  I really
21   can't say for sure because you're showing
22   me something that I need a microscope to
23   actually verify for sure.  And even then,
24   if I had a microscope, they'd be so grainy.
25   I can't even verify if it's Jon Bernthal.
```

```
 1                    S. SANDS
 2         Q.    Were you aware of other -- that
 3    there were other articles about the filming
 4    on this day --
 5         A.    It's just -- no.  I'm not aware
 6    of these.  It's a spec of dust.  I'm
 7    interested in getting the photo and
 8    licensing it.  I can't -- and you're asking
 9    me two and a half years later if I remember
10    this?
11         Q.    Mr. Sands, you started a
12    federal action over a series of five
13    photos.
14         A.    Over these photos.  I know
15    nothing about these photos.  I know nothing
16    about them.  I know nothing about these
17    articles, I know nothing about these
18    photos.  I know about -- I'm filing a
19    federal action on these photos.
20         Q.    Right.
21         A.    Not these.  I know nothing
22    about these.  They don't look familiar to
23    me.  Will I go home tonight with these
24    papers and see if they're mine?  These over
25    here.  Absolutely I will.  And if you want
```

1                    S. SANDS

2         Q.    Have these photos ever been

3    licensed to anybody?  Ever.

4         A.    I can't answer that.  I will

5    assume that they have.  I don't do this for

6    free.  But I have not looked at my

7    statements to -- do you have any

8    statements?

9         Q.    You haven't looked to see if

10   these photos were licensed to anybody?

11        A.    I don't really care.  I care

12   about who doesn't license them and then

13   uses them.  Okay?  I don't.

14        Q.    Well, how do you know -- how

15   would you know if something isn't licensed

16   if you don't look to see if it was

17   licensed?

18        A.    Because I already told you that

19   three times, I'm not going to repeat

20   myself.  No, I will repeat myself.  If it

21   doesn't have a name I assume it's stolen.

22   If it doesn't have a watermark or a name or

23   a credit, I assume it's stolen, as I said

24   before, and then I do my due diligence to

25   find out in all probability if it was

```
 1                    S. SANDS
 2    stolen.
 3         Q.    Basically, if someone put your
 4    name on a photo --
 5         A.    But this has nothing to do with
 6    you.  Because you already admitted that you
 7    stole my pictures.
 8         Q.    We have not admitted that.
 9              MR. FREEMAN:  Yes you have.
10         A.    Let's take a break.  You go
11    take a look at your own records.  Yes, you
12    did admit that you stole them.
13         Q.    Mr. Sands, if you're going to
14    walk out of the deposition --
15         A.    We'll come back in five
16    minutes.  Take a look at the records.  You
17    already admitted that you stole them --
18         Q.    Mr. Sands, I ask the questions
19    and you are not answering them.  We'll be
20    calling the court.
21              (The witness leaves the
22    deposition room.)
23              MR. FREEMAN:  It says, "CBS
24              Interactive admits that it does not
25              and has never had a license to use
```

```
 1                    S. SANDS
 2               MS. LACKMAN:  Let's mark as
 3          Exhibit 12 some excerpts from a
 4          series of -- a series of royalty
 5          statements.  The original range is
 6          Sands 679 to Sands 926.  I'm only
 7          going -- as with the other one, I'll
 8          only be marking particular pages.
 9               (Whereupon, Sales and Royalty
10          Statements, Excerpts SANDS through
11          926 was marked as Defendant's Exhibit
12          12 for identification as of this date
13          by the Reporter.)
14     Q.    Before you look at this, again,
15   this is the way this was provided to us so
16   I apologize for the size.
17               Are you aware of who Evolve
18   Media is?  In particular, are you aware
19   that Evolve Media owns comingsoon.net?
20     A.    I don't see what that has to do
21   with CBS.  But no, I wasn't aware of that.
22     Q.    If you turn to the second and
23   third pages, you should see at the bottom
24   of that where it says page 704, you see
25   right at the bottom and going over to page
```

1                    S. SANDS

2    705 there are several entries for Evolve

3    Media.  Do you see that?

4         A.    Yes, I do.

5         Q.    And do you see the license, the

6    sales date is October 6, 2016?  Do you see

7    that?

8         A.    Yes, I do.

9         Q.    And do you have any

10   understanding from the description what

11   these photos that are being licensed by

12   Evolve Media show?

13        A.    From the description it does

14   not say.  So I cannot answer.

15        Q.    So the reference to

16   October 5th, Jon Bernthal filming does not

17   refresh your recollection?

18        A.    I can't argue that somebody had

19   purchased something, but I don't know what

20   they purchased.  It doesn't say.

21        Q.    Did you take any other photos

22   of Jon Bernthal on October 5th?

23        A.    October what?

24        Q.    So on October 5th, 2016, did

25   you take any other photos of Jon Bernthal

```
 1                      S. SANDS
 2    onset?
 3         A.     Not that I can recall.
 4         Q.     So is it fair to assume that
 5    these photographs were The Punisher
 6    photographs that are -- were either at
 7    issue in this case or from the same day --
 8         A.     I'm not going to make any
 9    assumptions because then it upsets you.  So
10    I can't say based on what it says here, I
11    cannot say.  Show me the photo --
12         Q.     Do you have any --
13         A.     -- on what they're talking
14    about and then I can answer accurately.
15         Q.     Do you have a separate
16    understanding as to whether Evolve Media --
17    let me go back.
18                You said you would check to see
19    whether someone had a license.  Would you
20    be looking at documents other than these?
21         A.     No, I would not be looking at
22    documents.  I'd be looking at a photo.  I
23    already told you that four times.
24         Q.     You'd look at a photo to
25    determine whether a photo was licensed?
```

```
 1                     S. SANDS
 2          A.    I'm sure there has.  But I
 3    don't recall.
 4          Q.    So what you're saying is that
 5    if someone wants to get away with
 6    infringement, they should just put a credit
 7    on the site?
 8          A.    You said it, not me.
 9          Q.    Well, no, you did say it
10    because that seems to be the way you
11    verify.
12          A.    That's very true.  That's very
13    true.  If somebody put a credit Getty
14    Images, I would assume that it was not
15    stolen.  And many a time, what I do -- no,
16    I'm just going to give you what you want to
17    hear.
18          Q.    Don't give me what I want to
19    hear.  Give me the truth.
20          A.    That's what happened.
21    Sometimes, you're absolutely right, if
22    somebody wants to steal my image, they
23    could put Getty Images.  But a lot of
24    people, times they don't.  They put Marvel
25    and it has nothing to do with Marvel.
```

```
1                      S. SANDS
2    It doesn't say.
3          Q.    Let's show it to you.
4                MS. LACKMAN:  We'll mark as
5          Exhibit 13 --
6          A.    This is what I'm trying to help
7    you with.
8          Q.    I'm not looking for assistance.
9    I'm looking for answers.  There's a
10   difference.
11         A.    But you know, in reality I just
12   cannot comment on things that have nothing
13   to do with CBS Interactive because I don't
14   know.
15               MS. LACKMAN:  Let's mark as
16         Exhibit 13 an image with the language
17         at the top "Daredevil series
18         character appears on The Punisher
19         set."
20               (Whereupon, Daredevil Series
21         Character Photo was marked as
22         Defendant's Exhibit 13 for
23         identification as of this date by the
24         Reporter.)
25         A.    Ah, here we go.
```

1                         S. SANDS

2    on everything.  If you want to come back

3    another day --

4         A.    No, no, it's okay.  Please tell

5    me what question I haven't answered.

6         Q.    The question is, did Evolve

7    Media get this license as a package deal?

8         A.    I don't know.  It doesn't say.

9    It does not say.  I don't know.

10        Q.    Did you inquire?

11        A.    No.

12        Q.    Are you -- does $4.88 for an

13   online use of a photo sound unusual to you

14   or improper?

15        A.    It depends on the circumstances

16   that I outlined.  And it doesn't say on

17   this statement -- you'll notice there's a

18   huge blank here, which normally has

19   information.

20        Q.    Well, maybe you need to provide

21   us with more complete documents.

22        A.    This is what they gave me.

23             MR. FREEMAN:  You subpoenaed,

24         to be fair, and this is what he had

25         in his possession.

```
1                         S. SANDS
2     practice, I believe I can't get any money
3     for referrals.  And I don't care because
4     the more people that sue people like your
5     client, I just want it to stop.  I just
6     want to go back to the business of calling
7     for photos and licensing them.  That's all
8     I really want.  I don't like the business
9     of litigation.  I want to be shooting
10    Tiffany Haddish today.  And I have a
11    headache now because you're asking me all
12    these questions and I have no problem
13    answering them.
14         Q.    Isn't litigating --
15         A.    I just think it's sad that we
16    have to go through all this just to get
17    proper compensation.  And if corporations
18    were more responsive, maybe we wouldn't
19    have to do this.
20         Q.    Speech.
21         A.    I just don't like the practice
22    of lawyering up to shut me up.  That's not
23    gonna work.
24              MS. LACKMAN:  Let me mark as
25         Exhibit 16 -- let's mark as Exhibit
```

1                          S. SANDS

2          Q.    Were these all print uses?

3          A.    Yes.

4          Q.    Did they include rights for

5     online, do you know?

6          A.    No.

7          Q.    No you don't know?

8          A.    The Daily News, especially

9     online rights, are separate from --

10    different editors, different offices, are

11    separate from print.

12         Q.    Did you ever create a similar

13    e-mail for your lawyers for online uses?

14         A.    No.  I don't believe there

15    were -- I don't believe I had an

16    arrangement with The Daily News for online

17    usage.  Though I'm sure you'll find some

18    that were used online.

19         Q.    Did you have an arrangement

20    with anybody in the past five years for

21    online uses?

22         A.    What?

23         Q.    Did you have an arrangement

24    with anybody in the past five years for

25    online uses?

```
 1                      S. SANDS
 2          A.    No.
 3          Q.    Let's mark as Exhibit 21 a
 4    document Bates stamped Sands 56.
 5                (Whereupon, SANDS 56 was marked
 6                 as Defendant's Exhibit 21 for
 7                 identification as of this date by the
 8                 Reporter.)
 9          Q.    Do you recognize this document?
10          A.    Yes, I do.
11          Q.    Did you agree to a thousand
12    dollars for the whole set, print and web?
13          A.    You know, I don't believe there
14    was an answer on that.
15          Q.    Oh, okay.
16          A.    And a thousand dollars is a
17    thousand dollars.  And at the time I had a
18    good relationship with The Daily News
19    because they weren't begging for money.
20    And a thousand dollars sounded good so at
21    the time I really didn't care.
22          Q.    They weren't begging for money?
23    What do you mean by that?
24          A.    A thousand dollars, if it was
25    print and web, I don't know.  But even now,
```

1                    S. SANDS

2          A.    I don't even remember.  I might

3     have seen it today.  They all kind of look

4     the same to me, to be honest.  Once again,

5     I'm not a lawyer.

6          Q.    This one, if you see in the

7     first paragraph, it references Krysten

8     Ritter and Mike Colter on the TV series

9     Jessica Jones.  Do you see that?

10         A.    Oh, yeah.  That's right, you

11    guys have stolen before.  This is an

12    example that we had to file against you

13    before.

14         Q.    And you believe that CBS stole

15    photos from you in this case?

16         A.    I believe, and tell me if I'm

17    corrected --

18         Q.    I want to know what you

19    believe.

20         A.    -- that this was settled

21    because they didn't want to go to trial on

22    this because they knew they were guilty and

23    they paid out.  I don't remember any more

24    than that off the top of my head.

25         Q.    Would you be surprised if I

```
 1                        S. SANDS
 2            withdrawn.  I wasn't with the firm at
 3            this time so I can't represent what
 4            happened.
 5            Q.    I will represent to you that
 6     this lawsuit was withdrawn because there
 7     was a license to use these photos.
 8            A.    Do you have proof of that?
 9            Q.    Yes.  Talk to your lawyer when
10     you get back to the office.
11                 MR. FREEMAN:  Well, we haven't
12            received any production from your
13            office as to why this suit was
14            dismissed.  So you're making a naked
15            representation.
16                 MS. LACKMAN:  He doesn't know
17            that a lawsuit was filed and
18            withdrawn?
19                 MR. FREEMAN:  He's got
20            something over 50 lawsuits filed.
21                 MS. LACKMAN:  He only testified
22            that he has 20.
23                 MR. FREEMAN:  In one year he
24            said.
25            A.    Nor was I over his shoulder for
```

```
 1                         S. SANDS
 2    yes, you've taken steps?
 3              A.      In which example?
 4              Q.      In any example.
 5              A.      Which specifically?  We have to
 6    be specific now.
 7              Q.      Since that lawsuit was
 8    withdrawn, have you taken any steps to
 9    ensure that that doesn't happen again?
10              A.      I wasn't even aware that it was
11    withdrawn so I really can't answer that
12    question.  You'll have to ask Richard.  But
13    I support whatever decision he made as a
14    person who studied law, which I have not,
15    at least in detail to be a lawyer.  And if
16    he did something that he felt he needed to
17    do, I'm fine with that.
18                      And please, if you have any
19    information to tell me that you feel I
20    should know, please tell me.  Let's not
21    play games here.  Please tell me if you're
22    alluding to somebody that I should know
23    about to use due diligence, you're telling
24    me to talk to my lawyer, I have a lawyer
25    right here, he wasn't with the firm at the
```

```
 1                    S. SANDS
 2        Q.    How many days were you on the
 3   set?
 4        A.    They were only in town for
 5   one -- two days.
 6        Q.    Did you go both days?
 7        A.    Yes.
 8              MS. LACKMAN:  Let's mark as --
 9        Q.    Do you have any reason to
10   believe this is not your photograph?
11        A.    I'm not certain.  It has no
12   name on it.  It most likely was mine, but
13   you want me to confirm, I cannot confirm.
14   This looks more familiar to me.  But I
15   cannot confirm.
16              MS. LACKMAN:  We're going to
17         mark as Exhibit 24 another
18         photograph.
19              (Whereupon, Cumberbatch Photo
20         was marked as Defendant's Exhibit 24
21         for identification as of this date by
22         the Reporter.)
23        Q.    Do you recognize this
24   photograph?
25        A.    Yes, I do.
```

1                        S. SANDS

2           Q.    Did you take it?

3           A.    Once again, it has no

4    information that I can tell you -- you want

5    me to tell you beyond a reasonable doubt.

6    I know I was there.  It looks like a photo

7    that I would have taken.  If they had a set

8    photographer, I don't know.

9           Q.    Did you -- when you verified --

10          A.    But if I had signed off on it

11   as that you have stolen, then that means at

12   the time I did the proper vetting to make

13   sure it was the exact same photo.

14                But now you're asking me two

15   and a half years later, maybe three -- is

16   it two or three?  Two and a half years

17   later and you want me to tell you with a

18   hundred percent reliability, I can't.

19          Q.    That's fine.  You answered the

20   question.

21                When you verify the photos, how

22   do you go about doing that?  And then --

23          A.    Didn't I answer that question

24   five times already?

25          Q.    Do you look at them side by

1                       S. SANDS
2      side?
3             A.     I look at them side by side.
4             Q.     And then when you verify that
5      it is your photo, what do you do?
6             A.     I pass it on to the appropriate
7      people at the time.
8             Q.     So to your lawyers.
9             A.     To my lawyers.  Or to a
10     publication that I already have a
11     relationship with.
12            Q.     How do you notify your lawyers?
13     By e-mail?
14            A.     A phone call.
15            Q.     How do they know what photo --
16     when you call them, how do they know what
17     photo it is?
18            A.     I will tell them where to find
19     it, or I possibly will e-mail it to them.
20     Or they could find it on their own.  Or
21     they could have a tipster call them or me
22     to tell me, hey Steve, we saw your photo,
23     were you paid for it.  Those are the ways
24     we find out.
25                   And Richard might have other

```
 1                    S. SANDS
 2   at a time asking the same questions in true
 3   CBS harassing form.  It's 5:32.
 4         Q.    Did your lawyer tell you that
 5   when you sue someone you need to make
 6   yourself available for up to 7 hours of
 7   deposition?
 8         A.    I have made myself available
 9   and I wanted to go straight through because
10   I'm willing to do it and I have staying
11   power.  But I am leaving here the very same
12   way Eliza Dushku left her dealings with
13   CBS's lawyer with a major headache after
14   the way she was dealt with on the set of
15   Bull.
16         Q.    Maybe you can --
17         A.    Maybe CBS will stop harassing
18   people and start paying them.
19         Q.    Wait, hold off.  We're still on
20   the record.  Did you try to make any effort
21   to contact CBS prior to getting lawyers
22   involved?
23         A.    And I stated I do not remember.
24   But I will also state that I doubt I did.
25         Q.    Okay, no further questions.
```